## STATE OF CONNECTICUT *v.* JANET BAILEY
### (13406)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued October 13—decision released December 13, 1988

*Joette Katz,* public defender, with whom, on the brief, was *G. Douglas Nash,* assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Richard F. Jacobson* and *Henry J. Lyons,* assistant state's attorneys, for the appellee (state).

GLASS, J. The defendant, Janet Bailey, was charged with the crimes of assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[1] and carrying a pistol without a permit in violation of General Stat-

[1] "[General Statutes] Sec. 53a-59. ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

utes §§ 29-35 and 29-37 (b),[2] in connection with the January 25, 1986 shooting of Jeffrey Daniels. A six member jury found the defendant guilty on both charges. On January 30, 1987, she received concurrent sentences totalling five years imprisonment. She appeals from the judgment of conviction, claiming error

[2] At the time of the crime, General Statutes § 29-35 provided: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this section shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2; when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33."

At the time of the crime, General Statutes § 29-37 (b) provided: "Any person violating any provision of section 29-35 may be fined not more than one thousand dollars and shall be imprisoned not less than one year nor more than five years, and, in the absence of any mitigating circumstances as determined by the court, one year of the sentence imposed may not be suspended or reduced by the court. The court shall specifically state the mitigating circumstances, or the absence thereof, in writing for the record. Any pistol or revolver found in the possession of any person in violation of any provision of section 29-35 shall be forfeited."

In 1988, the legislature incorporated § 29-37 into § 29-35 and made other amendments not germane to the present case. Public Acts 1988, No. 88-128.

in the trial court's instructions to the jury on both charges and error in the court's failure to grant a judgment of acquittal on the pistol carrying charge. We find no reversible error.

Many of the critical facts in this case are disputed. Jeffrey Daniels and his wife, Penny Daniels, were married in 1984. They lived with their son, born prior to the marriage in 1982, at 29 New Era Court in Bridgeport. Jeffrey Daniels testified that during his marriage he had struck his wife, but claimed that he had done so in self-defense. Penny testified that Jeffrey had threatened and beaten her on several occasions. She stated that she had twice called police because her husband had beaten her, but on both occasions had declined to press charges.

The defendant had been friends with Penny since high school, and often visited her at the New Era Court apartment. Jeffrey testified that about one week after their marriage, he returned home to discover Penny and the defendant kissing and embracing on the couch. Jeffrey told his wife that he did not want the defendant in their home again, and warned her that he would take their son and move out if he ever again found Penny and the defendant in an amorous position. Penny testified that she had never been amorous with the defendant and claimed that Jeffrey did not like the defendant because he was worried about his reputation with his friends, who thought the defendant looked like a lesbian.

Jeffrey testified to the following version of events leading to the January 25, 1986 incident. At the time, he was living at the New Era Court apartment. On the previous day, he had returned home from work at about 2 p.m. and had found no one there. He changed clothes and went to his mother's home.

At 5 a.m. on January 25, 1986, he telephoned Penny to tell her he was coming over. Upon arriving at New

Era Court, Jeffrey discovered that the apartment locks
had been changed. He knocked on the front door but
received no response. He went to a telephone booth and
called Penny, but there was no answer. He then
returned to the apartment and, after again knocking
with no response, entered the apartment through an
open kitchen window. Jeffrey proceeded up the stairs
and observed the bedroom door being closed. He forced
the door open, entered the room and saw the defend-
ant on top of the bed covers and Penny and his son
under the covers. All three were naked. Jeffrey went
to the bed to get his son. Penny and the defendant
attacked him, and as he fought back, the defendant left
the bed and went to a corner of the room. During this
time, Jeffrey had taken the telephone away from Penny
as she attempted to hit him with it. The defendant then
returned to the bed. As Jeffrey turned and looked at
her from a distance of approximately ten feet, the
defendant shot him. Jeffrey then ran from the apart-
ment to his car.

The defendant and Penny offered the following ver-
sion of events. Penny testified that Jeffrey had ceased
to live with her on a regular basis three to four weeks
prior to the shooting. Penny had changed the locks on
the apartment two to three weeks before the incident,
and Jeffrey did not have a key. Upon Penny's invita-
tion, the defendant had moved in with her three to
seven days before the shooting.

The thrust of the defendant's and Penny's testimony
concerning the shooting was that the defendant had
acted in self-defense. Penny testified that on the day
of the incident, Jeffrey phoned her between 3 and 3:30
a.m. and asked if he could come over. Penny refused
his request. A short while later, she heard a knock on
the front door and saw Jeffrey, but did not admit him.
Penny then received a telephone call from her sister.
She heard a clicking sound during the conversation with

her sister, indicating that someone was attempting to call her. She assumed the call was from Jeffrey and did not answer it.

Shortly thereafter, as she and the defendant were watching television in an upstairs bedroom, Penny heard noises from downstairs and saw Jeffrey coming up the stairs. Penny's son was sleeping in the bedroom. Penny was partially clothed and the defendant was fully dressed. The defendant attempted to shut the door, but Jeffrey pushed it open and began to punch her and threaten to kill her. Penny, who still was speaking on the telephone, told her sister to call the police. Jeffrey then attacked Penny, hitting her with his fist and with the telephone. The defendant attempted to leave the room but Jeffrey pushed her and then beat her with his fist and the telephone. He then removed his jacket and advanced toward Penny, exclaiming that he intended to "fuck you bitches up." The defendant left the bed to retrieve her jacket from a nearby chair. Jeffrey again attacked the defendant, but she was able to remove a handgun from her jacket pocket. Seeing the gun, Jeffrey told the defendant that she would have to kill him or shoot him. The defendant then shot Jeffrey as he advanced on her. Jeffrey grabbed his stomach and fled the room. Penny never saw the gun, but assumed that the defendant had taken it from her jacket.

The defendant left the scene, telephoned her sister and asked her to have the defendant's brother-in-law, a police officer, meet her. The defendant then went to the police station accompanied by her brother-in-law. At the police station, the defendant was interviewed by two police officers. Both officers testified that the defendant had bruises, small cuts on her hand and forehead, a lump on her forehead, and a chipped tooth. One of the officers also interviewed Penny and observed a

lump on her forehead. Photographs of both the defendant and Penny taken after the shooting were admitted into evidence.

Officers who observed the scene of the incident testified that the telephone in the bedroom was broken but that there was no sign of a struggle and no blood. Shortly after the incident, the defendant gave a voluntary statement to one of the investigating officers. See *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In her statement, the defendant gave her address as 134 Marina Village in Bridgeport, the home of her mother.

On appeal, the defendant claims that the trial court erred in (1) failing to instruct the jury that it had to agree unanimously upon which of the alternative ways the state had disproven the defendant's claim of self-defense, (2) failing to instruct the jury that the defendant had no duty to retreat from the confrontation if she was a "dweller" at 29 New Era Court, (3) failing to instruct the jury that self-defense is a defense to the pistol carrying charge, and (4) failing to grant the defendant's motions for judgment of acquittal on the pistol carrying charge. We find no reversible error.

## I

The defendant first claims that the trial court violated her constitutional right to a unanimous jury verdict by failing to instruct the jury that it had to agree on which of the alternative ways the state had disproven her self-defense claim. There is no indication in the record that the defendant either submitted a request to charge on this issue, or took exception immediately after the charge was given. Because this claim was not properly preserved for appeal, this court is not bound to consider it. Practice Book §§ 852, 4185;[3] *State*

---

[3] "[Practice Book] Sec. 852. NECESSITY FOR REQUESTS TO CHARGE AND EXCEPTIONS

v. *Butler*, 207 Conn. 619, 629, 541 A.2d 865 (1988); *State* v. *Williamson*, 206 Conn. 685, 708, 539 A.2d 561 (1988).

The defendant suggests, however, that her claim is reviewable under *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 526 (1973), because it implicates fundamental due process rights. *Evans* "permits review of an unpreserved claim where the record adequately supports a claim that the defendant has been deprived of a fundamental constitutional right and a fair trial." *State* v. *Butler*, supra, 629; *State* v. *Gonzalez*, 205 Conn. 673, 685, 535 A.2d 345 (1987); *State* v. *Robinson*, 204 Conn. 207, 210 n.4, 527 A.2d 694 (1987); *State* v. *Miller*, 186 Conn. 654, 659, 443 A.2d 906 (1982). Accordingly, before addressing the merits of the claim, we must determine whether the defendant has been deprived of a fundamental constitutional right.[4]

---

"The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. Upon request, opportunity shall be given to present the exception out of the hearing of the jury."

"[Practice Book] Sec. 4185. ERRORS CONSIDERED

"The supreme court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The supreme court may in the interests of justice notice plain error not brought to the attention of the trial court.

"In jury trials, where there is a motion, argument, or offer of proof or evidence in the absence of the jury, whether during trial or before, pertaining to an issue that later arises in the presence of the jury, and counsel has fully complied with the requirements for preserving any objection or exception to the judge's adverse ruling thereon in the absence of the jury, the matter shall be deemed to be distinctly raised at the trial for purposes of this rule without a further objection or exception provided that the grounds for such objection or exception, and the ruling thereon as previously articulated, remain the same."

[4] Review under *State* v. *Evans*, 165 Conn. 61, 327 A.2d 526 (1973), involves four discrete questions. " 'First, does the defendant raise an issue which,

The defendant argues that the trial court's instruction that the state must disprove justification beyond a reasonable doubt did not convey to the jury the understanding that they must agree unanimously on the particular provision of the self-defense statute by which the state had refuted her claim. The trial court's charge on self-defense was based on General Statutes § 53a-19.[5] The court instructed the jury that the defend-

by its terms, implicates a fundamental constitutional right? This question looks solely to whether the label which the defendant places on the claim is constitutional in nature.

" 'Second, is the defendant's constitutional claim adequately supported by the record? This question requires that we review the record in a *limited* way and determine, on the basis of that limited review, whether the defendant's claim is truly of constitutional proportions or is simply characterized as such by the defendant. In those instances in which the Supreme Court . . . has already clearly indicated that the particular claim is or is not of constitutional proportions and therefore reviewable or not reviewable, a summary "yes" or "no" answer may be sufficient.

" 'Third, "was there, in fact, based on the record, a deprivation of a constitutional right of a criminal defendant?" *State* v. *Newton,* [8 Conn. App. 528, 531, 513 A.2d 1261 (1986)]. This question requires that we *fully* review the defendant's claim to determine whether a fundamental constitutional right of his was violated.

" 'Fourth, "did the deprivation deny the defendant a fair trial, thereby requiring" that his conviction be set aside. Id. This question requires that we determine, under appropriate standards of harmless error or other similar doctrines, whether the error requires reversal.' (Emphasis in original.) *State* v. *Thurman,* 10 Conn. App. 302, 306–307, 523 A.2d 891 (1987)." *State* v. *Huff,* 10 Conn. App. 330, 334, 523 A.2d 906, cert. denied, 203 Conn. 809, 525 A.2d 523 (1987); see also *State* v. *Torrence,* 196 Conn. 430, 434–36, 493 A.2d 865 (1985).

[5] "[General Statutes] Sec. 53a-19. USE OF PHYSICAL FORCE IN DEFENSE OF PERSON. (a) Except as provided in subsections (b) and (c) a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by

ant would not have been justified in using deadly physical force unless she reasonably believed that the victim, Jeffrey Daniels, was either using or about to use deadly physical force, or was inflicting or about to inflict great bodily harm, on the defendant or Penny Daniels. The court then charged the jury that the justification of self-defense would not apply if the defendant: (1) could have avoided the necessity of using force by retreating to a position of complete safety; or (2) provoked the victim's use of physical force; or (3) committed the initial aggression and did not withdraw from the encounter and effectively communicate to the victim her intent to withdraw. The court admonished the jury that the state had the burden of proving beyond a reasonable doubt that the defendant's conduct was unjustified. Elsewhere in the charge, the court instructed the jury that its verdict must be unanimous.

The defendant asserts that, under this charge, some jurors could have rejected the self-defense claim by concluding that the defendant's perception of the victim's use or threat of force was unreasonable; others could have found that the defendant should have retreated;

retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

others, that the defendant provoked the victim; and others, that the defendant was the aggressor and did not effectively withdraw from the encounter. She avers that such a scenario would have allowed the jury to believe that it had reached a unanimous verdict on self-defense despite differing as to how the defendant's conduct was unjustified.

We disagree with the defendant's contention that her first claim is reviewable under *Evans*. It is true that the constitution requires a unanimous verdict from a six member jury to support a conviction for a nonpetty offense. *Burch* v. *Louisiana,* 441 U.S. 130, 138, 99 S. Ct. 1623, 60 L. Ed. 2d 96 (1979); *State* v. *Benite,* 6 Conn. App. 667, 671, 507 A.2d 478 (1986); see Practice Book § 867.[6] In appropriate cases, a claim of error in the trial court's charge on unanimity "will be reviewed even if no request to charge was submitted and no exception to the charge was taken. *State* v. *West,* 3 Conn. App. 650, 654, 491 A.2d 428, cert. denied, 196 Conn. 810, 497 A.2d 906 (1985)." *State* v. *Benite,* supra; see also *State* v. *Golding,* 14 Conn. App. 272, 279, 541 A.2d 509, cert. granted, 209 Conn. 801, 548 A.2d 442 (1988); *State* v. *Jackson,* 13 Conn. App. 288, 294, 535 A.2d 1327 (1988). We are not persuaded, however, that the defendant's claim of a deprivation of her right to a unanimous jury verdict on her self-defense claim implicates a fundamental constitutional right.[7]

---

[6] "[Practice Book] Sec. 867.—RETURN OF VERDICT

"The verdict shall be general, but if the judicial authority instructs the jury regarding the defense of mental disease or defect, the jury, if they so find, shall declare the finding in their verdict. The verdict shall be unanimous and shall be announced by the jury in open court. If there are two or more defendants, the jury may return a verdict with respect to any defendant as to whom they agree. The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein, if the attempt is an offense."

[7] *State* v. *Quintana,* 209 Conn. 34, 50–51, 547 A.2d 534 (1988), is not to the contrary. In *Quintana,* the defendant similarly argued that the trial

In making this claim, the defendant relies heavily on *United States* v. *Gipson,* 553 F.2d 453, 457 (5th Cir. 1977), and a series of Connecticut Appellate Court cases. See *State* v. *Jackson,* supra; *State* v. *Edwards,* 10 Conn. App. 503, 524 A.2d 648, cert. denied, 204 Conn. 808, 528 A.2d 1155 (1987); *State* v. *Benite,* supra. In each of these cases, the state alleged arguably alternative means by which the defendant could have committed the crime. The defendant in each case claimed that, because the trial court did not instruct the jury that it must unanimously agree on the factual theory of the offense, the jury could have disagreed on what the defendant had actually done, yet could have collectively concluded that the defendant was guilty of the crime. See *United States* v. *Gipson,* supra, 455–56 (under statute, receiving or selling stolen vehicle alternative means to commit crime); *State* v. *Jackson,* supra, 294 (sale or dispensation of drugs); *State* v. *Edwards,* supra, 511 (unlawful entering or remaining on premises to commit burglary); *State* v. *Benite,* supra, 675 (burglary done while lethally armed or by inflicting bodily injury alternative means to commit burglary in first degree). *State* v. *Flynn,* 14 Conn. App. 10, 36–37, 539 A.2d 1005, cert. denied,    U.S.    , 109 S. Ct.

---

court's instructions allowed the jury to reject self-defense without agreeing on the alternative means in issue. Id., 49. We rejected this claim, observing that the verdict suggested that the jury did in fact agree on what the defendant had actually done. Id., 50. We stated: "[T]he focal point of contention in the defendant's asserted self-defense claim was not the manner in which the defendant's use of force had been unjustified. Rather, the jury's determination of this issue involved, again, a question of credibility [of the witnesses]." Id., 49. We held that, even if the trial court's failure to give a specific unanimity charge was error; id.; "the jury was free to reject the testimony regarding self-defense . . . . " Id., 51.

Because we concluded that the trial court had not erred in not giving a specific unanimity charge, our application of a constitutional standard for determining whether the court's instructions constituted harmful error was not compelled. Moreover, *Quintana* did not involve a claim for review under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 526 (1973).

226, 102 L. Ed. 2d 217 (1988), succinctly summarizes the teaching of these decisions. "Where a trial court charges a jury that the commission of any one of several alternative acts would subject a defendant to criminal liability, a unanimity charge on a specific act is required only if two conditions are met: (1) the alternative acts are *conceptually distinct* from each other; *and* (2) the state has presented *supporting evidence* on each alternative act. *State* v. *Benite,* supra, 674–75." (Emphasis in original.) Id., 38.

In essence, the unanimity requirement as enunciated in *Gipson* and its progeny requires the jury to agree on the factual basis of the offense. The rationale underlying the requirement is that a jury cannot be deemed to be unanimous if it applies inconsistent factual conclusions to alternative theories of criminal liability. See *United States* v. *Gipson,* supra, 458 and n.8; cf. *State* v. *Jones,* 193 Conn. 70, 75–77, 475 A.2d 1087 (1984) (indictment charged that defendant committed or attempted to commit robbery; specific unanimity charge not required); *State* v. *Flynn,* supra, 36–37 (assault on peace officer by injuring him during his performance of duty or by hurling object at him; specific unanimity charge not required); *State* v. *Lo Sacco,* 11 Conn. App. 24, 33, 525 A.2d 977, cert. denied, 204 Conn. 812, 528 A.2d 1158 (1987) (three ways of committing disorderly conduct; trial court's charge sufficient).

As *Gipson* itself recognizes, however, specific unanimity instructions are not required if the alternative bases of liability are not "conceptually distinct." *United States* v. *Gipson,* supra, 558. "The jury should not be obliged to decide between two statutorily prohibited ways of committing the crime if the two ways are practically indistinguishable." *Manson* v. *State,* 101 Wis. 2d 413, 430, 304 N.W.2d 729 (1981); *State* v. *Giwosky,* 109 Wis. 2d 446, 455, 326 N.W.2d 232 (1982). "The

determination of whether actions are conceptually distinct must be made with reference to the purpose behind the proposed charge: to ensure that the jurors are in unanimous agreement as to what conduct the defendant committed." *State* v. *Benite,* supra, 675.

It is significant that none of the cases relied on by the defendant concerns the question whether the jury must be instructed to agree unanimously on the factual basis for rejecting a claim of self-defense. Cf. *State* v. *Koput,* 142 Wis. 2d 370, 396–98, 418 N.W.2d 804 (1988). The defendant's argument assumes that because the jury must unanimously agree on the factual theory underlying the offense, it must also agree on the factual theory underlying disproof of a claim of self-defense. She offers no support for this proposition.

It appears to us, however, that the defendant's argument obscures fundamental distinctions between proof of liability and disproof of self-defense. A defendant bears the initial burden of producing sufficient evidence to inject self-defense into the case. *State* v. *Hardwick,* 1 Conn App. 609, 619, 475 A.2d 315, cert. denied, 193 Conn. 804, 476 A.2d 145 (1984). Once self-defense is in issue, the state must disprove it beyond a reasonable doubt. General Statutes § 53a-12 (a);[8] *State* v. *Cassino,* 188 Conn. 237, 243–44, 449 A.2d 154 (1982). As a practical matter, however, the defendant controls the shape and direction of a self-defense claim. The state must apply its proof to factual circumstances raised or illuminated by the defendant. In occupying this inferior tactical position, the state would face a Herculean task if it were required to present for the jury's unanimous agreement a definitive set of facts, neatly synthesized in a unified theory, designed to

[8] "[General Statutes] Sec. 53a-12. DEFENSES; BURDEN OF PROOF. (a) When a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt."

explain why the defendant's conduct was not justified. We believe that the defendant's argument, therefore, would lead to a practical incongruity in the state's role of disproving self-defense.

Despite serious reservation about the applicability of the unanimity requirement to self-defense, we do not, at this juncture, express the opinion that a specific unanimity charge would never be required for claims of self-defense, for it is clear that the requirement as refined by case law in the wake of *Gipson* does not apply to the facts of the present case.

Applying the criterion of "conceptual distinctiveness," a number of cases following *Gipson* have held that a specific unanimity charge is not required where the defendant's conduct does not comprise "separate incidents" implicating alternative or conceptually distinct bases of liability. In *State* v. *Giwosky,* supra, 456, the defendant claimed that his right to a unanimous verdict was violated because the trial court did not instruct the jury that it must unanimously agree on whether the defendant had committed a battery (1) when he threw a log at the victim or (2) when he struck the victim with his fists. The court held, however, that the encounter, which lasted two minutes, "was a short continuous incident that cannot be factually separated." Id. The court stated that a specific unanimity charge would have been unreasonable, since "[t]o impose the further requirement that the jury must . . . agree as to whether the victim was struck with the piece of wood or was injured during the altercation . . . is to require the jury 'to draw a line finer than that which the human conduct sought to be defined will realistically permit.' " Id., 458. Thus, the court concluded that the defendant could be convicted of battery despite the possibility that some of the jurors based their conclusion of guilt on evidence of the log throwing and others on evidence of the fistfight. Id.; see also

*United States* v. *Schiff,* 801 F.2d 108, 115 (2d Cir. 1986), cert. denied, 480 U.S. 945, 107 S. Ct. 1603, 94 L. Ed. 2d 789 (1987) (alleged acts of failing to file tax return, failing to pay tax and concealing income so closely interrelated that separate unanimity charge not required); *Lampkins* v. *Gagnon,* 710 F.2d 374, 377 (7th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S. Ct. 729, 79 L. Ed. 2d 189 (1984) (jury allowed to convict on alternative bases whether defendant conspired or actually participated in crime); *Rice* v. *State,* 311 Md. 116, 135–36, 532 A.2d 1357 (1987) (jury not required to distinguish whether conviction was based on grounds of stealing or possession of stolen property).

Moreover, a number of courts have acknowledged the need to avoid unwarranted multiplication of specific unanimity instructions by requiring such a charge only in "cases where the complexity of the evidence or other factors create a genuine danger of jury confusion." *United States* v. *Schiff,* supra, 114–15; see also *United States* v. *Payseno,* 782 F.2d 832, 835–37 (9th Cir. 1986); *United States* v. *Peterson,* 768 F.2d 64, 66–67 (2d Cir.), cert. denied, 474 U.S. 923, 106 S. Ct. 257, 88 L. Ed. 2d 264 (1985).

In the present case, the altercation between the victim and the defendant and Penny Daniels was brief, and took place within the confines of one room. The picture emerging from the disputed evidence was that of a whirlwind of physical and emotional turbulence. While the jury was instructed to consider several factors pertaining to the self-defense claim, these factors were applicable to a "short continuous incident" that realistically could not be atomized into discrete, distinct events. *State* v. *Giwosky,* supra, 456. After reviewing the record, we are not persuaded that the court was required to instruct the jury that it had to reach a unanimous agreement on at least one of the grounds for rejecting the defendant's self-defense claim. Moreover,

we do not perceive in this case a complexity of evidence or other factors creating a need for a specific unanimity charge. *United States* v. *Schiff,* supra, 114–15. We conclude that the defendant's first claim is not one of genuine constitutional proportions. *State* v. *Huff,* 10 Conn. App. 330, 334, 523 A.2d 906, cert. denied, 203 Conn. 809, 525 A.2d 523 (1987).

We further note, however, that even if the trial court's failure to give a specific unanimity charge was error subject to review under *Evans,* the error would not be grounds for reversal. *State* v. *Benite,* supra, 675–76. When an error in jury instructions in a criminal case is of constitutional dimension, we will not reverse a conviction unless it is reasonably possible that the jury was misled. *State* v. *Quintana,* 209 Conn. 34, 50, 547 A.2d 534 (1988). " 'We have often said that the charge should be read as a whole in determining whether it is reasonably possible that an erroneous instruction could have misled a jury . . . . "It is well established . . . that individual instructions are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict . . . and not critically dissected in a microscopic search for possible error. . . ." ' (Citations omitted.)" *State* v. *Quintana,* supra, 51.

In the present case, the trial court's instructions adequately conveyed to the jury an understanding that its verdict must be unanimous. The court on several occasions informed the jury that its responsibility was to determine what had actually taken place. In addition, during the portion of the charge on evaluating the credibility of witnesses, a matter of utmost importance in this case; *State* v. *Quintana,* supra; the court told the jury that it must reach its own conclusions "in corroboration with each other." Near the conclusion of its

charge, the court stated: "I will remind you at this point in time that whatever your verdict will be, it must be unanimous. . . . Each and every one of you must be unanimous in your verdicts. . . ." The court further indicated that after the verdict was delivered, the court might ask the jury if its verdict was unanimous. The court also stated that the jury would be free during its deliberations to ask the court for clarification on its obligation to reach a unanimous verdict. In view of these instructions, any further comment on the need to reach a unanimous agreement on what had taken place would have been supererogatory at best.

## II

The defendant's second claim is that the trial court erred in omitting to instruct the jury during the self-defense charge that the defendant would not have had to retreat from the altercation if the jury found that 29 New Era Court was her "dwelling."

The trial court charged the jury that "even if the defendant was justified in reasonably believing that Jeffrey Daniels was about to use deadly physical force or was about to inflict great bodily harm, could the defendant . . . have avoided the use of deadly physical force by retreating from the confrontation with complete safety to herself and Penny Daniels? Now, if she could have retreated with complete safety, then the use of deadly physical force would not have been justified."

General Statutes § 53a-19 (b) (1)[9] provides in part that a person is not justified in using deadly physical force if he knows that he can avoid danger with complete safety "by retreating, except that the actor shall not be required to retreat if he is in his dwelling . . . ." The trial court did not refer to this exception to the "retreat rule" of § 53a-19 (b) (1). The defendant argues

[9] See footnote 5, supra.

that since she presented substantial evidence that she lived at 29 New Era Court, the trial court's failure to instruct the jury on the exception to the retreat requirement meant that the jury could have rejected the self-defense claim on the basis of the defendant's failure to retreat, without considering the exception applicable to persons in their own dwellings.

The defendant did not request the court to charge the jury on the exception of § 53a-19 (b) (1), nor did she except to the charge after it was given. Consequently, the claim was not preserved for appeal. Practice Book § 852. The defendant argues, once again, that this claim is reviewable under *State* v. *Evans,* supra. Because the state concedes that her second claim implicates a constitutional right to proper jury instructions on self-defense; *State* v. *DeJesus,* 194 Conn. 376, 388, 481 A.2d 1277 (1984); see also *State* v. *Miller,* 186 Conn. 654, 660–61; 443 A.2d 906 (1982); we will assume that *Evans* review is appropriate.

The state does not seriously contest the defendant's assertion that she was entitled to proper instructions concerning the defendant's obligation to retreat from the confrontation. "If the defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction." *State* v. *Fuller,* 199 Conn. 273, 278, 506 A.2d 556 (1986). Once self-defense is asserted, the defendant is entitled to "proper jury instructions on the elements of self defense . . . ." *State* v. *Miller,* supra, 660–61. In the present case, the defendant and Penny Daniels testified in detail that the defendant lived at 29 New Era Court. This evidence was sufficient to raise the issue of the dweller exception to the "retreat" rule. The trial court, therefore, should have instructed the jury on the dweller exception of General Statutes § 53a-19 (b) (1). Id.

The state argues, however, that any error in the trial court's failure to refer to the dweller exception was harmless beyond a reasonable doubt. See *State* v. *Cohane,* 193 Conn. 474, 485, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984). It points out that the trial court did address the question of the defendant's dwelling with respect to the pistol carrying charge. On that charge, the defendant was prosecuted for violating General Statutes § 29-35,[10] which provides in relevant part: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same . . . ." Pursuant to § 29-35, the trial court instructed the jury that the defendant "would be only justified in so possessing [the pistol] without a permit if [29 New Era Court was] in fact her dwelling house." The state asserts that because the jury found the defendant guilty of violating § 29-35, it necessarily found that the defendant did not dwell at 29 New Era Court. As a consequence, the state argues, any error in the court's failure to instruct the jury in the self-defense charge on the dweller's exception to the retreat requirement was harmless beyond a reasonable doubt.

We agree with the state that the jury's guilty verdict on the pistol carrying charge rendered harmless beyond a reasonable doubt the trial court's failure to address the dweller's right not to retreat during the self-defense instructions pertaining to the assault charge. In returning a guilty verdict on the pistol carrying charge, the jury necessarily concluded that the defendant was not in her dwelling at the time specified in the complaint. There was substantial evidence by which the jury could reasonably have reached this conclusion. In her statement to police immediately after

[10] See footnote 2, supra.

the incident, the defendant stated that her address was 134 Marina Village in Bridgeport, her mother's house. The defendant testified that she had been staying with Penny Daniels for one week or less and that most of her clothes and personal effects were left at her mother's house. Further, Penny Daniels testified that the defendant did not have a key to the apartment. Jeffrey Daniels also testified that the defendant did not live at 29 New Era Court. Upon this evidence, the jury could reasonably have concluded that the defendant did not dwell at 29 New Era Court. See *State* v. *Hufford,* 205 Conn. 386, 391, 533 A.2d 866 (1987).

The defendant argues, however, that the definition of "dwelling" recited by the trial court materially differed from that of General Statutes § 53a-100, the definition required for self-defense instructions. General Statutes § 53a-19 (b) (1). Section 53a-100 (a) (2) defines dwelling as a "building which is usually occupied by a person lodging therein at night, whether or not a person is actually present." The court, however, defined "dwelling" by reference to Webster's Third New Collegiate Dictionary,[11] stating that a "dwelling house [is] a house or part of a house that is occupied as a residence. . . . [A] resident is defined as one who resides in a place; one who dwells in a place for a period of some duration." The defendant asserts that the references to "residence" and "duration" in the trial court's definition arguably lengthened the period of occupancy necessary to qualify a place as a "dwelling." As a result, she maintains that the jury may have concluded that the defendant was not a dweller at 29 New Era Court under the trial court's definition of that term even though they may have reached a different conclusion under the definition of § 53a-100 (a) (2).

---

[11] General Statutes § 29-35 does not define "dwelling," nor refer to any other statutory definition. See footnote 2, supra.

We are not persuaded that the trial court's definition of dwelling was materially different from the definition provided by § 53a-100 (a) (2). Contrary to the defendant's contention, § 53a-100 contemplates a "duration" element by requiring "usual" inhabitation at night. "Usual" in this context obviously means customary or routine occupancy; Webster, New Collegiate Dictionary (1974); in short, occupation for "some period of duration." Moreover, the trial court's reference to the term "residence" did not create a broader definition of "dweller" than that provided by § 53a-100. The trial court stated: "Now, there has been testimony from Penny Daniels that she had asked the defendant to reside with her at 29 New Era Court. The defendant indicates that she did in fact reside there; that she brought some clothes with her and that it was her intention to reside there. The state claims, of course, that she was only a visitor and points to the evidence that she had only a minimal amount of clothing at the residence and that she, in fact, did not even have a key . . . to the apartment." The court then charged the jury that the state must prove beyond a reasonable doubt that the defendant did not reside at the apartment. The trial court's charge directly linked the term "reside," the root of the word "residence," with the defendant's evidence, presented with respect to both charges, that she was a dweller at 29 New Era Court. Under these instructions, the jury should not have found the defendant guilty if it found that her evidence created a reasonable doubt on whether she was a dweller at 29 New Era Court.

The defendant further argues that the trial court's failure to raise the issue of the dweller's right not to retreat in the self-defense instructions was harmful error because it precluded the possibility of inconsistent verdicts. She claims that if the jury had been properly presented with the dweller exception to the retreat

requirement during the court's charge on self-defense, the jury could have found on that issue that she was a dweller, thereby acquitting her of assault, but still could have convicted her on the gun carrying charge. As a consequence, she contends, the jury's finding that the defendant did not dwell on the premises implied by its guilty verdict on the pistol charge cannot support her conviction on the assault charge.

On several occasions, this court has refused to reverse a verdict of guilty on one count where that verdict appeared to be inconsistent with a verdict of acquittal on another count. See *State* v. *Jackson,* 194 Conn. 241, 243–44, 478 A.2d 1018 (1984) (inconsistent verdicts on robbery charges arising out of same incident upheld); *State* v. *Martin,* 189 Conn. 1, 6–7, 454 A.2d 256, cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983) (trial court erred in relying on inconsistency in setting aside conviction on injury charge where defendant acquitted on related assault charge); *State* v. *Morgan,* 179 Conn. 617, 620 and n.2, 427 A.2d 429 (1980) (acquittal on assault did not require acquittal on less serious endangerment charge); *State* v. *Rosado,* 178 Conn. 704, 708–709, 425 A.2d 108 (1979) (inconsistent verdicts on possession and sale of narcotics upheld). The law permits inconsistent verdicts because of the recognition that jury deliberations necessarily involve negotiation and compromise. *Steadman* v. *United States,* 358 A.2d 329, 332 (D.C. App. 1976). "[I]nconsistency of the verdicts is immaterial. *State* v. *Manning,* 162 Conn. 112, 122, 291 A.2d 750 (1971). As Justice Holmes long ago observed in the case of *Dunn* v. *United States,* 284 U.S. 390, 393–94, 52 S. Ct. 189, 76 L. Ed. 356 (1932): ' "The most that can be said in such cases [i.e., of inconsistent verdicts] is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We inter-

pret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity." [*Steckler* v. *United States*, 7 F.2d 59, 60 (2d Cir. 1925)] . . . That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.' " *State* v. *Rosado,* supra, 708–709.

The defendant seeks to transmogrify this pragmatic accommodation of the results of the deliberation process into a criminal defendant's right. We are not persuaded that a criminal defendant has any greater right to obtain an inconsistent verdict than he has to avoid one. Further, our holding by no means disparages the decisions that acknowledge the validity of inconsistent verdicts. In the present case, the defendant could have created the possibility of inconsistency on the dwelling issue by requesting the trial court to instruct the jury on the dweller exception to the retreat requirement during its self-defense charge.[12] The trial court's failure to create this possibility sua sponte did not deprive the defendant of a fundamental right. *State* v. *Evans,* supra.

## III

The defendant next argues that the trial court erred in not instructing the jury that self-defense could be a defense to the pistol carrying charge. The defendant did not request a charge on this claim, nor except

---

[12] We note that in *State* v. *Shaw,* 185 Conn. 372, 382, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982), we adopted the "codweller" rule, which denies to a defendant claiming self-defense the privilege of not retreating in one's premises if the premises also are the dwelling place of the victim/assailant. Consequently, we held that the trial court did not err when it declined to instruct the jury that the defendant had no duty to retreat from an assailant who dwelled in the premises where the incident occurred.

to the charge after it was given; Practice Book § 852; but asserts as with the preceding two issues that her claim is reviewable under *State* v. *Evans,* supra. The defendant's claim of a right to self-defense instructions on the gun carrying charge is without merit.

General Statutes § 29-35 prohibits the carrying of a pistol without a permit except in one's dwelling. The defendant argues that if § 29-35 is read to prohibit the right to bear arms in self-defense, thereby excluding a claim of self-defense arising from facts existing at the time the statute is allegedly violated, then it would infringe article first, § 15, of the Connecticut constitution. That section provides that "[e]very citizen has a right to bear arms in defense of himself and the state."

It is beyond serious dispute that the legislature has the authority to place reasonable restrictions on a citizen's right to bear arms. Section 29-35 does not forbid persons from carrying a pistol to protect themselves. It simply places a reasonable limitation on that right by requiring any person who chooses to do so to obtain a permit. Moreover, as the issues in this case illustrate, the statute allows persons to carry a pistol in their own dwelling without a permit.[13]

---

[13] The defendant cites a number of New York decisions to support her argument that a conviction for possession of a weapon may not stand if the possession was in self-defense. Most of these cases are factually inapposite. See, e.g., *People* v. *Davis,* 61 App. Div. 2d 760, 761, 402 N.Y.S.2d 9 (1978) (defendant entitled to instruction of "temporary, lawful possession" on weapons charge where defendant testified that he obtained weapon by disarming attacker); *People* v. *Messado,* 49 App. Div. 2d 560, 370 N.Y.S.2d 616 (1975) (temporary, innocent possession defense applicable where defendant may have gained possession of weapon by disarming attacker). Other cases have allowed the defense on the grounds that temporary, lawful possession may rebut a presumption that the defendant intended to use the gun unlawfully. See, e.g., *People* v. *Lewis,* 116 App. Div. 2d 16, 19–20, 499 N.Y.S.2d 709 (1986); see also *People* v. *Steele,* 26 N.Y.2d 526, 529, 260 N.E.2d 527, 311 N.Y.S.2d 889 (1970) (reversing convictions for assault and unlawful weapon possession for trial court's failure to instruct on self-

The defendant herself acknowledges the legitimacy of the permit requirement. In her brief, she states that the right to bear arms under the Connecticut constitution is an absolute right, any encroachments of which "must be limited to the question of reasonableness of the defendant's perceptions." She adds that "the carrying of a gun by a [person dangerous because of mental instability], whose assessment of when self-defense is called for cannot be trusted, would not fall within the protective zone." Rather than leaving to the courts the troublesome task of deciding after the fact whether the person carrying the pistol was a "reasonable" person, however, the legislature has chosen instead to require licensing to preempt the possibility that unstable or irresponsible individuals may carry pistols.[14]

In the present case, the defendant was tried for violating § 29-35 because the state alleged that she car-

---

defense; appellate court did not specifically discuss application of defense to possession charge); *People* v. *Pendergraft,* 50 App. Div. 2d 531, 532, 374 N.Y.S.2d 669 (1975) (factual issue whether possession of gun temporary and innocent). Under General Statutes § 29-35, there is no issue as to intent of unlawful use. See footnote 2, supra.

In 1984, New York's highest court distinguished the defense of "temporary, lawful possession" from a defense of justification, holding that the latter does not apply to a charge of unlawful possession of a weapon. *People* v. *Almodovar,* 6 N.Y.2d 126, 130, 464 N.E.2d 463, 476 N.Y.S.2d 95 (1984). "[I]t is difficult to imagine circumstances where [self-defense] could excuse unlawful possession of [a weapon] . . . ." Id. The court noted, however, that temporary, lawful possession was a defense, and stated that the defense would apply, for example, if the defendant found the weapon shortly before he "possessed" it, and intended to turn it over to authorities. Id.

[14] The statutory scheme concerning the permit requirement for pistols provides that municipal authorities may issue a permit to carry a pistol, "provided that authority shall find that such applicant intends to make no use of any pistol or revolver which he may be permitted to carry thereunder other than a lawful use and that such person is a suitable person to receive such permit." General Statutes § 29-28. Full disclosure of an applicant's criminal record is required, and permits may not be issued to convicted felons. General Statutes § 29-29. Persons aggrieved by a decision of the issuing authority may appeal the decision to a board of firearms permit examiners. General Statutes § 29-32b (a) through (c).

ried a pistol without a permit at approximately 5:30 a.m. on January 25, 1987. The defendant was not charged with violating the statute in that she used the pistol to assault Jeffrey Daniels. In claiming self-defense to this charge, the defendant is asserting a justification for carrying the pistol, not for using that pistol as she did. Under General Statutes § 53a-19 (a), however, a claim of self-defense may be invoked only to justify the actor's *use* of reasonable physical force. Self-defense does not apply if a defendant's use of force is not in issue. Because the use of force is not an issue in a prosecution for a violation of § 29-35, the defendant's self-defense claim is immaterial. Cf. *State* v. *Holloway,* 11 Conn. App. 665, 671 and n.6, 528 A.2d 1176 (1987).[15]

We are not persuaded by the defendant's theory that her carrying of the pistol was a "threat" of the use of force sufficient to invoke the justification of self-defense. The defendant asserts that § 53a-19 contemplates instances in which an actor claiming self-defense threatens to use force as well as instances in which the actor uses force. She argues that because the evidence was sufficient to establish that her carrying of the pistol was in fact a threat to use force, the trial court should have instructed the jury that self-defense would apply to the pistol carrying charge.

We express no opinion on whether § 53a-19 applies as a defense to prosecutions for crimes concerning the threat of use of force. That is not the case before us. The defendant in the present case was charged with carrying a pistol, not with threatening to use it. Even if the defendant's conduct in carrying the pistol was factually inseparable from a threat by her to use force,

---

[15] In *State* v. *Holloway,* 11 Conn. App. 665, 671 and n.6, 528 A.2d 1176 (1987), the court held that the trial court's instruction on self-defense to the charge of carrying a deadly weapon in violation of General Statutes § 53-206 was erroneous.

the only legal question arising from the conduct was whether she was carrying the pistol without a permit in violation of § 29-35. We conclude that the defendant was not entitled to a self-defense instruction under § 53a-19 to the charge of carrying a pistol without a permit.[16]

## IV

The defendant's final claim is that the trial court committed reversible error in failing to grant the defendant's motions for judgment of acquittal on the pistol carrying charge made at the close of the state's case and at the close of all the evidence. She argues that there was insufficient evidence to support the allegation that she carried the pistol.[17] The trial court denied both motions.

" 'When a verdict is challenged because of insufficient evidence, the issue is whether the jury could have

[16] The defendant also claims that self-defense qualifies as a justification for carrying a pistol without a permit under General Statutes § 53a-17. That statute provides: "Unless inconsistent with any provision of this chapter defining justifiable use of physical force, or with any other provision of law, conduct which would otherwise constitute an offense is justifiable when such conduct is required or authorized by a provision of law or by a judicial decree, including but not limited to (1) laws defining duties and functions of public servants, (2) laws defining duties of private citizens to assist public servants in the performance of certain of their functions, (3) laws governing the execution of legal process, (4) laws governing the military services and the conduct of war, and (5) judgments and orders of courts."

She argues that article first, § 15, of the Connecticut constitution is a "provision of law" authorizing the carrying of a pistol without a permit for self-defense purposes. Our discussion above makes it clear that article first, § 15, has no such effect.

Moreover, our discussion above disposes of the defendant's argument that her claim should be reviewed under the "plain error" doctrine. Practice Book § 4185.

[17] We disagree with the state's argument that we should not review this claim because the reasoning the defendant puts forward on appeal was not argued to the trial court. A review of the transcripts indicates that the defendant based her motions for judgment of acquittal on a claim of insufficient evidence that the defendant carried the pistol.

reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Benton,* 161 Conn. 404, 407, 288 A.2d 411 (1971).' *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980); see *State* v. *Carter,* 196 Conn. 36, 44, 490 A.2d 1000 (1985). 'The evidence must be given a construction most favorable to sustaining the jury's verdict.' *State* v. *Carter,* supra." *State* v. *Findlay,* 198 Conn. 328, 333, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986). Because the defendant elected to present evidence, we review the evidence in toto to determine whether it was sufficient to uphold the jury's verdict. *State* v. *Simino,* 200 Conn. 113, 118, 509 A.2d 1039 (1986).

The state's information charged that the defendant on the day and time in question "did carry on her person a pistol, without a legal permit therefore" while not in her dwelling place. The trial court instructed the jury that the defendant was being charged "with possessing the pistol on January 25th, 1986 around 5:30 a.m. within the premises at 29 New Era Court, Bridgeport." The court specifically told the jury that it could not find the defendant guilty for carrying the pistol to or from the scene.

The defendant claims that under the trial court's instructions and the state's information, the defendant was alleged to have carried the pistol when she held it to shoot the victim. She contends, however, that the language of § 29-35, prohibiting the "carry[ing]" of a pistol on one's "person," as well as the legislative history of the statute, contemplates that "carrying" requires more than mere "holding" or "possession."

We disagree with the defendant's contention that the state's complaint and the court's charge limited the jury

to finding that the defendant "carried" the pistol only when she shot Jeffrey Daniels. The information clearly alleged that the defendant "carried" the pistol while she was in the apartment, and did not limit the allegation of "carrying" to the single moment when the defendant pointed the pistol at Jeffrey Daniels. There was sufficient evidence to support the defendant's conviction. State's witness Jeffrey Daniels testified that during the altercation the defendant left the bed, went to a corner of the bedroom, returned to the bed and pointed and shot the pistol at him from a distance of no more than ten feet. The state also introduced a statement given by the defendant to police immediately after the incident in which she disclosed that she had owned the pistol for a couple of months. In that statement, she admitted that she had removed the pistol from her jacket prior to shooting the victim. The defendant also testified that she had brought the gun into the apartment.

The trial court's charge made it clear that the jury could not find the defendant guilty of violating § 29-35 for acts not specified in the information. The information and the court's charge obviously did not preclude the jury from considering direct evidence pertaining to the defendant's conduct while she was in the apartment. Nor did it preclude the jury from considering evidence of other acts to draw the logical inference that the defendant carried the gun as charged. A review of this evidence recited above indicates that the jury could have concluded beyond a reasonable doubt from the facts established and logical inferences drawn therefrom that the defendant carried the pistol in violation of § 29-35. *State* v. *Findlay,* supra, 333.

There is no error.

In this opinion the other justices concurred.