STATE OF CONNECTICUT *v.* WILLIAM SMITH
(13441)

SHEA, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued June 7—decision released August 15, 1989

*Karen Goodrow,* special public defender, for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert Lacobelle,* assistant state's attorney, for the appellee (state).

HULL, J. The defendant, William Smith, was charged with murder in violation of General Statutes § 53a-54a (a)[1] and conspiracy to commit murder in violation of General Statutes §§ 53a-48[2] and 53a-54a (a). His first trial

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

ended in a mistrial when the jury was unable to reach a verdict. In a second trial, a jury found the defendant guilty of both murder and conspiracy to commit murder. From this judgment the defendant appeals, claiming that the trial court erred in: (1) charging the jury that the defendant could be found guilty of murder on an accessory theory of liability; (2) failing to charge the jury that it had to agree unanimously on the factual predicate for the defendant's conviction on the murder count; (3) failing to instruct the jury on the lesser included offenses of manslaughter in the second degree and criminally negligent homicide; and (4) refusing to give a curative instruction to the jury explaining the outcome of the defendant's prior trial. We find no error.

The jury could reasonably have found the following facts. At approximately 7:30 p.m. on February 21, 1986, the defendant met Wendy Kelleher at the corner of Main Street and Fairfield Avenue in Bridgeport. The purpose of their prearranged meeting was to drive in Kelleher's car to the P.T. Barnum housing project in Bridgeport to make a drug purchase. After one failed attempt at finding someone from whom to purchase drugs, the defendant directed Kelleher to drive to a side street and park the car in the middle of the block. He left the car and returned with a man who was later identified as Frank Wright. Pursuant to Wright's directions, the three drove to another Bridgeport location presumably to make a drug purchase, although none was made.

They then drove to Golden Hill Street where the defendant got out of the car and went into an apartment that was occupied by Ann Duguay and Harold Hill. The defendant had spent the previous night in the apartment and prior to that had occupied an apartment on Milne Street with Duguay and Hill. The defendant appeared upset and expressed to both Duguay and Hill that he was angry at a man named Joseph Fiore. He

further told Hill of his intent to "get Fiore" for having "snitched" on the defendant for things he had done with credit cards and account numbers while he and Fiore were at Odyssey House, a drug rehabilitation institute in Bridgeport. As the defendant was leaving the apartment, he took with him a paring knife and a crowbar.

Once back in Kelleher's car, the defendant directed her to drive to Milne Street and told her to park near a particular alley so that he could walk through the alley to get to the Hilltop Hotel where Fiore was living. Kelleher believed that the defendant wanted to see Fiore about some stolen money or stolen checks. Both Wright and the defendant went into the dark alley. The defendant walked through the alley and then walked alone toward the hotel. Fiore was not home, so the defendant spoke with Anthony Novicky, Fiore's roommate, who told the defendant to come back later in the evening. The defendant, still alone, retraced his steps from the hotel to the alley entrance. He then emerged from the opposite end of the alley with Wright at his side. When the defendant got back in the car, he kept repeating the words "fucking Fiore" in an angry tone.

The three then went back to the P.T. Barnum housing project to buy drugs. After making the purchase, they ingested the drugs at an apartment that Wright was sharing with Deborah Hendricks. A short time thereafter, the defendant directed Kelleher to drive back to Milne Street and park in the same location in which she previously had parked. Wright and the defendant left the car and entered the dark alley. As the defendant had done previously, he walked through the alley and then toward the Hilltop Hotel. This time Fiore was home and had a conversation with the defendant, which was overheard by Novicky, about where he and the defendant might go to buy cocaine and heroin. They then left the hotel together.

The defendant and Fiore walked toward the dark alley. After they entered the alley, Kelleher, who was standing outside her car on Milne Street, heard Fiore say, "Hey, what's going on?" Kelleher then heard what she thought was the sound of a cracking skull. A very short time later, Wright and the defendant walked out of the alley toward Kelleher's car. The defendant, who had blood smears on the crotch and thigh area of his pants, was carrying a pipe. Prior to getting into Kelleher's car, he handed the pipe to Wright, who wiped it in the snow. Either Wright or the defendant said, "He's dead." The defendant then drove the car to a bridge, where Wright threw the pipe into the water.

Later that night, an area resident discovered the dead body of Fiore in the alley. The cause of death was trauma to the head caused by no fewer than four blows of extensive force with a blunt instrument.

The next day, February 22, 1986, the defendant appeared at the apartment of Duguay and Hill. He changed his clothes and put the clothes he had been wearing into a bag that he had taken with him when he left. The defendant told Hill he had "gotten" Fiore and had left his body behind the building where Hill, Duguay and the defendant previously had lived. The defendant returned the crowbar and paring knife, saying he had not used them to kill Fiore.

On March 26, 1986, a pipe was recovered from the Pequonnock River at the Stratford Avenue Bridge in Bridgeport. Kelleher testified that it looked like the pipe that Wright had thrown from the bridge. Hendricks identified it as a pipe that had been in her apartment prior to the night of February 21, 1986. Dr. Arkady Katsnelson, an associate medical examiner, testified at trial that a pipe is a blunt instrument and could have been the weapon used to kill Fiore.

## I

The defendant first claims that the trial court erred in charging the jury under General Statutes § 53a-8,[3] criminal liability for acts of another, because there was insufficient evidence to support the charge. The defendant argues insufficiency of the evidence in two respects: (1) the evidence presented at trial did not support the trial court's instruction on accessory liability in general, because the evidence tended to prove only principal liability; and (2) the evidence presented at trial did not support the trial court's instructions regarding the specific alternative ways in which the defendant could be held liable as an accessory. We do not find insufficient evidence in either respect.

Under § 53a-8, a person may be prosecuted and punished as if he were a principal offender when, "acting with the mental state required for commission of an offense, [he] solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense . . . ." Therefore, as we have stated in the past, "[t]he terms [accessory and principal] refer to the alternate means by which one substantive crime may be committed. *State* v. *Baker,* 195 Conn. 598, 608, 489 A.2d 1041 (1985)." *State* v. *Kemp,* 199 Conn. 473, 480 n.4, 507 A.2d 1387 (1986).

" 'Where a person may have been convicted under more than one statutory alternative, the judgment cannot be supported unless the evidence was sufficient

---

[3] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

to establish guilt under each statutory provision which the trier may have relied upon.' *State* v. *Marino,* 190 Conn. 639, 650–51, 462 A.2d 1021 (1983) . . . . This rule is based on the principle that jurors are presumed to follow the instructions given by the judge. *State* v. *Barber,* 173 Conn. 153, 156, 376 A.2d 1108 (1977); *State* v. *DellaCamera,* 166 Conn. 557, 567, 353 A.2d 750 (1974)." *State* v. *Williams,* 202 Conn. 349, 363–64, 521 A.2d 150 (1987). A court's instruction to the jury on a particular statutory alternative authorizes the jury to consider that theory of criminality, thus clearly implying that there is a factual question for them to resolve under the statute. Id., 364. The defendant argues that the evidence introduced by the state presented no factual question related to accessory liability, because the evidence tended to prove only principal liability. The state maintains that the evidence presented at the trial was sufficient to prove the defendant guilty as either a principal or an accessory because, while ample evidence was presented pertaining to the involvement of the defendant and Wright in the murder, no direct evidence was before the jury as to who struck the blows that killed the victim.

"In accordance with well established principles, appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task. 'We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985),

and cases there cited." *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987).

The jury was justified in finding that the defendant and Wright were both in the alley when the victim was killed. Both the defendant and Wright had left Kelleher's car and walked into the alley near which the defendant had specifically directed Kelleher to park. The defendant then went alone to Fiore's apartment. When Fiore entered the alley, under the impression that he and the defendant were walking to a car in which they would travel to make a drug purchase, he was hit repeatedly with a blunt instrument. Wright and the defendant then emerged from the alley. The defendant's pants were smeared with blood and he was carrying a pipe that had come from the apartment where Wright was staying. Before getting back into the car, the defendant handed the pipe to Wright, who wiped it in the snow. One of the men commented that the victim was dead.

From this evidence, taken in the light most favorable to sustaining the verdict, we cannot say as a matter of law that the jury as the trier of fact could not reasonably have concluded that Wright struck the blows that killed the victim while the defendant acted as an accessory. " 'It is within the province of the trier of fact to draw reasonable and logical inferences from the facts proven, but it may not resort to speculation and conjecture. *State* v. *Kish,* 186 Conn. 757, 768, 443 A.2d 1274 (1982); *State* v. *Tucker,* 181 Conn. 406, 418, 435 A.2d 986 (1980). Any inferences drawn must be rational and founded upon the evidence. *State* v. *Clemons,* 168 Conn. 395, 401, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975). The jury may base an inference on facts it finds as the result of other inferences. *State* v. *Gabriel,* [192 Conn. 405, 425, 473 A.2d 300 (1984)]; *State* v. *McGinnis,* 158 Conn. 124, 130, 256 A.2d 241 (1969) . . . . ' " *State*

v. *Williams,* supra, 355, quoting *State* v. *Little,* 194 Conn. 665, 673–74, 485 A.2d 913 (1984). The jury could fairly have inferred the following: Wright waited in the alley with the pipe while the defendant lured Fiore into the darkness. Wright struck Fiore with the pipe, and then handed it to the defendant while Wright checked to see if the victim was dead or alive. The defendant, attempting to clean the blood from the pipe, wiped it onto his clothing. As Wright and the defendant emerged from the alley, the defendant handed the pipe back to Wright. Wright wiped the remaining blood from it and informed the defendant that Fiore was dead.

The defendant relies on the testimony of Hill to contradict these inferences arguing that the defendant's statement to Hill is direct evidence tending to prove only principal liability. Hill testified that the day following the murder, the defendant told him that he had "gotten Fiore" and had left him behind the building where Hill, Duguay and the defendant had previously lived. We disagree with the defendant that this evidence prohibits the jury from inferring that the defendant acted as an accessory. In light of the evidence previously set forth, it was reasonable for the jury to infer that the defendant's statement to Hill was an announcement of the crime in which he had been involved, but not an announcement of the precise role that he had played in that crime. Ample evidence was before the jury to support a finding that the defendant acted in the role of an accessory in the murder of Fiore. Accordingly, we do not find error in the trial court's instruction to the jury that it could find the defendant guilty of murder on an accessory theory of liability.

The defendant argues further, however, that the trial court gave instructions upon statutory alternatives within General Statutes § 53a-8 that were not supported by the evidence. The trial court instructed the

jury that it could find the defendant guilty as an accessory if he "solicited or requested or commanded or importuned or intentionally aided another person in the commission of a murder." The defendant argues that no evidence was presented to establish that the defendant acted in any of the ways described by the trial court, nor was any evidence presented that the defendant "act[ed] with the mental state required for commission of an offense" as required by § 53a-8.

The defendant did not except to the court's instruction based upon this specific argument. However, "[t]his court has consistently held that a claim that the judge improperly instructed the jury on an element of an offense is appealable even if not raised at trial. See, e.g., *State* v. *Hill,* [201 Conn. 505, 512–13, 518 A.2d 388 (1986)]; *State* v. *Zayas,* 195 Conn. 611, 616, 490 A.2d 68 (1985); *State* v. *Smith,* [194 Conn. 213, 217, 479 A.2d 814 (1984)]." *State* v. *Williams,* supra, 363.

We incorporate our previous discussion regarding appellate review of sufficiency claims in rejecting the defendant's argument. Reviewing the evidence in the light most favorable to sustaining the verdict, we note that the following evidence was presented to the jury. The defendant specifically directed Kelleher to the location where they picked up Wright. The defendant then obtained possible murder weapons before going to the victim's apartment. Subsequently, the scenario discussed previously was set up when the defendant went to Fiore's apartment. We conclude that this evidence sufficiently supports the inference that both the defendant and Wright were involved in the murder of Fiore. The precise characterization, under the language of § 53a-8, of the defendant's particular actions was within the province of the jury as the trier of fact.

Likewise, "[w]here there is sufficient evidence to support a reasonable inference that the defendant intended

to commit the crime charged, whether such an inference should be drawn is properly a question for the jury to decide. *State* v. *Morrill,* 193 Conn. 602, 609, 478 A.2d 994 (1984)." *State* v. *Williams,* supra, 357. "Intention is a mental process which, of necessity, must be proven either by the statements or the actions of the person whose conduct is being examined. *State* v. *Mazzadra,* [141 Conn. 731, 735, 109 A.2d 873 (1954)]." Id., 356–57. Beyond the mere actions of the defendant, evidence was presented before the jury that the defendant was angry at the victim and had expressed an intent to "get him." Additionally, Kelleher testified that the defendant was speaking degradingly about Fiore in an angry tone. We conclude that the cumulative effect of the evidence was sufficient to establish guilt beyond a reasonable doubt under any of the statutory alternatives contained within § 53a-8. Accordingly, we find no error in the trial court's instruction with respect to accessory liability.

## II

The defendant next claims that the trial court erred in failing to instruct the jury specifically that it had to agree unanimously on the factual predicate for his conviction on the murder count. The trial court charged the jury that it could find the defendant guilty as either a principal or an accessory and continued by explaining the alternative ways in which the defendant could be held liable as an accessory. The trial court instructed the jury that its verdict must be unanimous; however, the defendant argues that because the trial court failed to instruct the jury that it must reach a unanimous agreement as to the factual theory of the crime, the jurors could have disagreed on what the defendant had actually done, yet collectively could have concluded that he was guilty of a crime. This omission, argues the defendant, violated his constitutional rights to due process and a fair trial.

The defendant did not request a specific unanimity charge on the alternative theories of liability, nor did he except to the charge on this ground after it was given. Consequently, this claim has not been preserved for appellate review in accordance with Practice Book § 852.[4] Traditionally, both this court and the Appellate Court have reviewed such unanimity claims even when a defendant has failed to request a specific unanimity charge or to take proper exceptions. See, e.g., *State* v. *Spigarolo,* 210 Conn. 359, 388, 556 A.2d 112 (1989); *State* v. *Suggs,* 209 Conn. 733, 760, 553 A.2d 1110 (1989); *State* v. *Benite,* 6 Conn. App. 667, 671, 507 A.2d 478 (1986). We will therefore review this claim under the fundamental right-fair trial rationale of *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), recognizing the potential for violation of the defendant's fundamental constitutional rights to due process and a fair trial if the jury were allowed to reach a verdict not based on substantial agreement as to the conduct engaged in by the defendant.

The defendant relies on *United States* v. *Gipson,* 553 F.2d 453 (5th Cir. 1977), *State* v. *Bailey,* 209 Conn. 322, 551 A.2d 1206 (1988), and *State* v. *Benite,* supra, as support for his claim that a specific unanimity instruction was required. We are not persuaded that these cases support the defendant's claim. "In essence, the unanimity requirement as enunciated in *Gipson* and its progeny requires the jury to agree on the factual basis of the offense." *State* v. *Bailey,* supra, 334. " 'Where a trial court charges a jury that the commission of any

[4] "[Practice Book] Sec. 852. NECESSITY FOR REQUESTS TO CHARGE AND EXCEPTIONS

"The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. Upon request, opportunity shall be given to present the exception out of the hearing of the jury."

one of several alternative acts would subject a defendant to criminal liability, a unanimity charge on a specific act is required only if two conditions are met: (1) the alternative acts are *conceptually distinct* from each other; *and* (2) the state has presented *supporting evidence* on each alternative act. *State* v. *Benite,* supra, 674–75.' (Emphasis in original.)" Id., 334, quoting *State* v. *Flynn,* 14 Conn. App. 10, 38, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988). "Alternative bases of liability are not conceptually distinct if ' "the two ways [of committing the crime] are practically indistinguishable." *Manson* v. *State,* 101 Wis. 2d 413, 430, 304 N.W.2d 729 (1981).' *State* v. *Bailey,* supra." *State* v. *Suggs,* supra, 761.

Applying these principles to the defendant's claims, we conclude that principal and accessory liability are not conceptually distinct within the meaning of *Gipson.* We find support for this conclusion in the decision of *United States* v. *Petersen,* 768 F.2d 64 (2d Cir.), cert. denied, 474 U.S. 923, 106 S. Ct. 257, 88 L. Ed. 2d 264 (1985). Faced with the same issue under the language of 18 U.S.C. § 2 (a),[5] the *Petersen* court determined that principal liability and accessory liability do not fall within " 'distinct conceptual groupings.' " Id., 67. The court read the "distinct conceptual grouping" qualification to the unanimity requirement in *Gipson* to refer "to situations where the same act is characterized in different ways, each of which constitutes a crime under the same count of an indictment." Id. The court determined that in a case involving potential accessory liability, the jury should be regarded as unanimous even if some jurors believed that the defendant was an aider and abetter, while other jurors believed that he was the principal: "The jury would still have been unani-

---

[5] Title 18 of the United States Code, § 2 (a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

mous in finding the acts proved to have been committed by [the defendant] were sufficient to make him guilty as a principal under 18 U.S.C. § 2 (a)." Id.

Under General Statutes § 53a-8, " 'there is no practical significance in being labeled an "accessory" or a "principal" for the purpose of determining criminal responsibility.' *State* v. *Harris,* 198 Conn. 158, 164, 502 A.2d 880 (1985). The terms refer to the alternate means by which one substantive crime may be committed. *State* v. *Baker,* [supra, 608]." *State* v. *Kemp,* supra, 480 n.4. Under Connecticut law, a defendant may be convicted as an accessory even though he was charged only as a principal as long as the evidence presented at trial is sufficient to establish accessorial conduct. *State* v. *Fleming,* 198 Conn. 255, 268 n.15, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). In the present case a set of facts was presented to the jury that was subject to a variety of reasonable inferences. Those inferences, derived from only one set of facts, could have led to either a conclusion that the defendant acted as an accessory or a conclusion that he acted as a principal. As in *Petersen,* either way the jurors characterized the defendant's particular actions, the jury would have been unanimous in finding the defendant guilty as a principal of the substantive crime charged. Therefore, we conclude that accessory and principal liability are not conceptually distinct. Accordingly, the trial court did not err by failing to give a specific unanimity charge.

Likewise, the defendant's claim that the statutory alternatives under § 53a-8 each require specific unanimity instructions fails under *Gipson.* The trial court defined the terms of § 53a-8 as follows: "to ask earnestly"; "to ask for or express a desire for"; "to order or direct"; "to command, urge or incite"; and "to assist, help or support." It is clear from these definitions that the alternative bases of liability under § 53a-8 are prac-

tically indistinguishable. They represent slightly different characterizations that can be given the defendant's particular conduct, all of which make a defendant an accessory to a crime. Therefore, the terms of § 53a-8 are not conceptually distinct. Accordingly, the trial court did not err by failing to give a specific unanimity charge on each theory of liability under the statute.

## III

The defendant next claims that the trial court erred in refusing to charge the jury on the lesser included offenses of manslaughter in the second degree and criminally negligent homicide. The trial court instructed the jury that it might find the defendant guilty of the crime of murder or of a number of lesser included offenses, including manslaughter in the first degree. The defendant had requested the court to charge, in addition, that the jury consider the lesser included offenses of manslaughter in the second degree; General Statutes § 53a-56;[6] and criminally negligent homicide. General Statutes § 53a-58.[7] The trial court denied the defendant's request. The defendant argues that this denial constitutes reversible error. We disagree.

General Statutes § 53a-45 (c) provides that the jury trying a person for murder "may find him guilty of homicide in a lesser degree than that charged." "Whether the defendant was entitled to a jury instruction on a lesser degree of homicide pursuant to this statute depends on whether the third and fourth requirements set out in *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980), were met. '[T]he evi-

---

[6] General Statutes § 53a-56 provides in pertinent part: "(a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[7] General Statutes § 53a-58 provides in pertinent part: "(a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person . . . ."

dence . . . [must] support a conviction of the lesser included offense and . . . the elements differentiating the lesser offense . . . [must be] sufficiently in dispute to justify finding the defendant innocent of the greater offense but guilty of the lesser.' *State* v. *Maselli,* 182 Conn 66, 72, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981); see *State* v. *Falby,* 187 Conn. 6, 28–29, 444 A.2d 213 (1982); *State* v. *Rodriguez,* 180 Conn. 382, 407–408, 429 A.2d 919 (1980)." *State* v. *Burge,* 195 Conn. 232, 243–44, 487 A.2d 532 (1985).

The element that distinguishes manslaughter in the second degree and criminally negligent homicide from murder is the required mental state. *State* v. *Rodriguez,* supra, 403. To commit manslaughter in the second degree, a person must "recklessly" cause the death of another; General Statutes § 53a-56 (a) (1); i.e., he must be "aware of and consciously [disregard] a substantial and unjustifiable risk that such result will occur . . . ." General Statutes § 53a-3 (13). To commit criminally negligent homicide, a person must, with criminal negligence, cause the death of another person; General Statutes § 53a-58; i.e., he must fail "to perceive a substantial and unjustifiable risk that such result will occur . . . ." General Statutes § 53a-3 (14). Viewing the evidence presented at trial in the light most favorable to the defendant, as we must; see *State* v. *Smith,* 185 Conn. 63, 77, 441 A.2d 84 (1981); we conclude that the evidence does not support a conviction of either manslaughter in the second degree or criminally negligent homicide.

The defendant argues that the jury could reasonably have believed that he and Wright went to the alley with the intention of purchasing drugs from Fiore. The defendant further hypothesizes that the jury could have believed that during the drug transaction, the defendant acted with the intent to threaten or assault Fiore,

which instead resulted in the recklessly or negligently caused death of Fiore.[8] The defendant's claim is flawed, however, in that no evidence was presented that a drug transaction took place or was supposed to have taken place in the alley. To the contrary, Kelleher testified that the defendant wanted to see Fiore that evening about some stolen money or stolen checks. Hill testified that the defendant was angry and upset at Fiore and that he wanted to "get him" for "snitching" on him. The only testimony concerning a drug transaction with respect to Fiore came from Anthony Novicky, who was present when the defendant came to lure Fiore into the alley. Even if that evidence is construed in the light most favorable to the defendant, however, the drug purchase was not to be among Wright, the defendant and the victim. Novicky testified that the defendant and Fiore discussed driving to Clinton Avenue and State Street to buy drugs. Therefore, there was no evidence before the jury to support the defendant's contention that the jury could have inferred that the defendant acted with a less culpable mental state. Accordingly, under the third prong of *State* v. *Whistnant,* supra, the trial court did not err in refusing to instruct the jury on manslaughter in the second degree and criminally negligent homicide.

## IV

The defendant's final claim is that the trial court erred in refusing to give a curative instruction to the jury explaining the outcome of his prior trial. The defendant claims that an answer to a question on cross-examination so prejudiced his right to a fair trial and an impartial jury that reversal is required. We disagree.

---

[8] The defendant's argument is presumably that an instruction on criminally negligent homicide would have been warranted under these circumstances due to the defendant's prior ingestion of drugs.

During direct examination, Wendy Kelleher testified that she saw the defendant holding a pipe as he and Wright emerged from the alley where the victim had been killed. On cross-examination she admitted testifying previously that Wright had been holding the pipe when the two men emerged from the alley. Following this admission, the following exchange occurred:

"Q. And back in September of last year at another hearing under oath did you not indicate that it was Frank Wright that came out of the alley holding the pipe? If you recall?

"A. I believe I did.

"Q. And today you say it is different; is that correct?

"A. That is correct. . . .

"Q. When were you last shown the pipe that you can recall, before —

"A. Last trial.

"Q. Before today?

"A. The last time I was here for trial."

Defense counsel then continued questioning the witness. Only after the jury was excused for the day and sent home did he request that a curative instruction be given to the jury explaining that the defendant's prior trial had not resulted in either a conviction or an acquittal.[9] Counsel argued that the jurors would otherwise naturally assume that there had been an earlier conviction, prejudicing the defendant's right to a fair trial and an impartial jury. The next morning, after having given defense counsel an opportunity to brief the issue, the court refused to give the curative instruction.

---

[9] Defense counsel explained his failure to object to the answer earlier: "I didn't draw attention to it at the time because I didn't want the jury to—maybe I thought it might—I was hoping it would slip by them."

We conclude that any error here claimed by the defendant was invited by him during his cross-examination of Kelleher. During cross-examination, defense counsel made repeated attempts to impeach Kelleher with inconsistent statements she had made at the defendant's prior trial. In so doing, defense counsel made eleven references to Kelleher's previous testimony under oath, though he was careful to refer to the prior trial as "another hearing" or "prior hearing." The answer here in question was in response to defense counsel's question of when Kelleher was last shown the pipe. Not aware of the subtle nuances of using the word "hearing" rather than "trial," Kelleher responded that she last saw the pipe at the defendant's prior trial. Defense counsel then asked for a clarification, presumably to ascertain if she was referring to the present trial. Kelleher answered that she was in fact referring to the defendant's prior trial. Although not phrased in language the defendant would have preferred, Kelleher's answers were responsive to the questions asked. "So long as the answer is clearly responsive to the question asked, the questioner may not later secure a reversal on the basis of any invited error." *State* v. *Brokaw,* 183 Conn. 29, 33, 438 A.2d 815 (1981), and cases therein cited.

We further note that the defendant did not make use of certain procedures available to him with respect to this claim of error. First, given his concern over the jury's awareness of his prior trial, the defendant should have followed the common practice of filing a motion in limine to prevent any witness from referring to his prior trial.[10] Second, the defendant should have

---

[10] "A motion in limine 'in a broad sense [refers] to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence *before the evidence is actually offered.' Luce* v. *United States,* 469 U.S. 38, 40 n.2, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)." (Emphasis added.) *State* v. *Harrell,* 199 Conn. 255, 259 n.4, 506 A.2d 1041 (1986).

renewed his request for a curative instruction in his written request to charge pursuant to Practice Book § 852. "While this court does not favor unyielding adherence to rules of procedure where the interests of justice are thereby disserved, we have rejected the broad claim that a trial court has an independent obligation ' "to instruct, sua sponte, on general principles of law relevant to all issues raised in evidence." '; *State* v. *Preyer,* 198 Conn 190, 198 n.9, 502 A.2d 858 (1985) . . . ." *State* v. *McIntosh,* 199 Conn. 155, 160, 506 A.2d 104 (1986). "The ever increasing refinement of our law justifies the cooperation of counsel in stating requests for jury instructions, and this cooperation is mandated, at least to the extent of substantial compliance with Practice Book § 852." Id., 160–61.

There is no error.

In this opinion the other justices concurred.