[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is a petition requesting habeas corpus relief from allegedly illegal confinement resulting from the petitioner's judgment of conviction, after a jury trial, of murder and conspiracy to commit murder, in violation of General Statutes53a-54a(a) and 53a-48, for which judgment of conviction the petitioner received a total, effective sentence of sixty years to serve. The amended petition comprises four counts claiming that the petitioner's imprisonment is illegal because (1) the judgment of conviction was secured in violation of his constitutional right to due process in that the prosecutor withheld exculpatory material; (2) the judgment was obtained in violation of his due process rights in that the petitioner was improperly advised regarding his right to testify in his own behalf at his criminal trial; (3) the trial court lacked jurisdiction to hear the matter because of a defective probable cause hearing; and (4) the petitioner's trial counsel rendered ineffective assistance. The first and third claims have been withdrawn.
The petitioner and Frank Wright were arrested for the murder, CT Page 1628 on February 21, 1986, of Joseph Fiore in Bridgeport. The petitioner pleaded not guilty to the charges of murder and conspiracy and elected a jury trial. His first trial ended in a mistrial because of a hung jury. His second trial resulted, on January 25, 1988, in guilty verdicts, for which offenses the petitioner was sentenced to sixty and twenty years confinement, consecutive. The Review Division made these sentences concurrent. The petitioner appealed, and the judgment of conviction was affirmed, State v. Smith, 212 Conn. 593 (1989).
On June 9, 1989, the petitioner filed this habeas action. In response to the filing of the amended petition, the respondent generally denies that any illegality in obtaining the conviction occurred and also contends that the petitioner's procedural default in failing to raise on direct appeal the claims contained in the second count of the amended petition preclude habeas review unless the petitioner can demonstrate good cause for such default and prejudice.
 I
As to the second count, the court finds that the petitioner has failed to establish good cause for failing to raise the issue of improper waiver of the petitioner's right to testify in his criminal trial. In Johnson v. Commissioner, 218 Conn. 403 (1991), our Supreme Court adopted the "cause and prejudice" reviewability test of Wainwright v. Sykes, 433 U.S. 72 (1977). Under that test a habeas petitioner has the burden of showing both good cause for his procedural default and actual prejudice before habeas corpus relief is available, Id., 419. The cause and prejudice standard has recently been extended to apply to the failure to raise issues on direct appeal as well as to defaults occurring at trial, Jackson v. Commissioner, 227 Conn. 124, 132 (1993).
In his posttrial brief, the petitioner omits argument as to this standard. It is apparent that the petitioner has chosen to pursue the issue of misadvisement regarding his right to testify within the framework of the ineffective assistance claim contained in the fourth count rather than as an independent, due process claim, separate from ineffective assistance, as set forth in the second count of the amended petition. The petitioner has failed to present sufficient evidence of good cause for not raising his due process violation argument on direct appeal. Thus, he is not entitled to review of this claim on the merits, Daniels v. Warden,28 Conn. App. 64, 73 (1992). CT Page 1629
 II
Turning to the fourth count of the amended petition, it should be noted that our Supreme Court has adopted the two-pronged Strickland standard for evaluating ineffective assistance claims, Ostolaza v. Warden, 26 Conn. App. 758, 761 (1992). That test requires that the petitioner demonstrate, by a preponderance of the evidence, both that his counsel's performance was substandard and that there exists a reasonable probability that, but for counsel's deficiencies, the outcome of the proceedings would have been different, Id. If it is easier to dispose of an ineffective assistance claim on the ground of insufficient prejudice, a habeas court need not address the performance prong of the Strickland standard, Pelletier v. Warden, 32 Conn. App. 38, 46 (1993). Because the court concludes that an analysis of the prejudice component of this test is dispositive, the court proceeds to that analysis directly.
Additional facts are necessary in order to address this issue. At the petitioner's criminal trial, Harold Hill testified for the state (Petitioner's Exhibit B, pp. 242 through 271). He indicated that shortly before Fiore was killed, the petitioner visited with Hill, and the petitioner appeared very upset. Upon Hill's inquiry, the petitioner stated he was angry at the victim because the victim had snitched on him. The petitioner threatened that he was "going to get" the victim, and left Hill's apartment armed with a crowbar and a knife. The day after the slaying, the petitioner again spoke with Hill and told Hill that "he had gotten [the victim] and that he fucked him up" and that the petitioner had left the victim's body behind an apartment building. Hill asked the petitioner if he had used the crowbar to kill the victim, and the petitioner replied that he had used another instrument which had been disposed of. Hill's testimony regarding the petitioner's conduct preceding and following the homicide was corroborated by another witness, Ann Duguay (Petitioner's Exhibit B, pp. 204 through 231).
Wendy Kelleher also testified for the prosecution (Petitioner's Exhibit B, pp. 83 through 168). She also noted the petitioner's anger toward the victim. She described how she drove the petitioner and Wright to an area near the victim's residence. When the victim proved to be elsewhere, she drove them to a housing project where narcotics were purchased and from there to an apartment where the drugs were ingested. Later she drove them back to the victim's neighborhood. By this time the victim had returned CT Page 1630 and was engaged in conversation with the petitioner. She observed the petitioner and the victim enter a dark alley. Shortly thereafter she heard the victim say, "Hey, what's going on?" This question was followed by the sound of a skull being cracked, which sound was, in turn, followed by the sounds of more blows. Wright and the petitioner exited the alley and approached Kelleher's car. The petitioner was carrying a section of metal pipe and had blood stains on his clothes. The petitioner handed the pipe to Wright who wiped it on some snow. Kelleher then drove Wright and the petitioner to a bridge where Wright discarded the pipe into the water. When the petitioner reentered her car after emerging from the alley he remarked, "Well, he's dead."
An autopsy of the corpse disclosed that the victim died from repeated blunt trauma to the back of his head.
The petitioner has withdrawn all claims of ineffectiveness but two. The surviving claims assert that his trial counsel, Attorney David Abbamonte, rendered ineffective assistance by incompetently advising the petitioner regarding his right to take the stand in his own defense and by failing to call Wright to testify (Petitioner's posttrial brief, p. 12).
Wright testified at the habeas hearing to the effect that it was he, and not the petitioner, who bludgeoned the victim in the alley. Wright is presently serving an eighteen year sentence, imposed after pleading guilty to being an accessory to manslaughter first degree, for his part in the incident.
The petitioner also testified at the habeas hearing. He neither denied nor confirmed his participation in the beating. He stated that, had he testified at his criminal trial, he would have told the truth which is that the victim was killed, not because he was a snitch, but because he was believed to have molested Kelleher's young daughter. His testimony amounts merely to an indication that the reason the victim was killed differed from that forwarded by the prosecution witnesses at his criminal trial.
It should be noted that while Wright accepted responsibility for delivering the fatal blows, he never characterized the petitioner as a mere bystander to the beating nor affirmatively disconnected the petitioner from the incident in any other way. Wright's testimony, if it were to be believed, was consistent with the petitioner being an accessory or co-conspirator in the execution of the plan to bludgeon the victim. CT Page 1631
Of paramount importance, however, is the fact that Wright had given two statements to the police within a week of the killing, which implicate the petitioner as the assailant (Petitioner's Exhibits A-1 and A-2). These statements describe how the petitioner spoke to Wright to see if Wright could obtain a gun for the petitioner. They indicate that the petitioner was searching for the victim and required a weapon so the petitioner could "fuck [the victim] up any way he could." Wright, who had no apparent previous connection with the victim, gave a metal pipe to the petitioner. The petitioner took the pipe and set out to find the victim. About an hour later, the petitioner returned and asked if Wright would act as a lookout in exchange for $100.00. Wright who thought that the petitioner was merely going to rough up the victim, agreed and accompanied the petitioner and Kelleher to seek the victim. The victim was eventually located, and the petitioner greeted the victim in an ostensibly cordial manner. Wright, the victim, and the petitioner walked up an alley. The petitioner retrieved the pipe from behind a tree where he had previously concealed it. The petitioner then struck the victim in the head with the pipe felling him. As the victim lay on the ground, the petitioner delivered more blows. Wright grabbed the petitioner's arm and pulled him out of the alley. The petitioner gave the pipe to Wright who later threw the pipe from the bridge into the water. Wright indicated that, after the incident, the petitioner remarked that he had "fixed that mother-fucker" and that the victim would not "fuck with anybody's kid again."
The court finds that Wright's statements inculpating the petitioner were consistent with the other evidence in the case and were credible. The court disbelieves Wright's testimony at the habeas hearing that he was the actual killer. The court feels that this testimony was generated by the opportunity five years later to assist the petitioner at no risk to himself. The court further finds that the petitioner has failed to prove that Wright's testimony if called to be a witness at the petitioner's criminal trial would have exonerated the petitioner rather than implicated him.
Assuming, arguendo, that Wright would have testified at the petitioner's criminal trial that he killed the victim, other factors militate against the usefulness of this testimony for the petitioner. Once Wright testified at the petitioner's trial, his previous contradictory statements, which were strongly incriminating to the petitioner, would have been admissible and CT Page 1632 could be considered by the jury for their substance as well as for impeachment purposes, State v. Whelan, 200 Conn. 743, 753 (1986). Added to the evidence which the jury already found sufficient to prove the petitioner's guilt beyond a reasonable doubt would be the statements of an accessory and eyewitness to the crime, which statements squarely identify the petitioner as the assailant. The benefit to the petitioner to be gained by having Wright, who was already sentenced for his role in the incident and could not be punished further to any significant degree, appears to the court to be far outweighed by the devastating effect introduction of Wright's statements would have had to the defense case. The prosecution case would have been strengthened rather than weakened by calling Wright to testify, even assuming that he would have testified favorably for the petitioner, an assumption which this court has found to be unlikely.
As mentioned above, the petitioner's expected testimony at his criminal trial, based on his testimony at the habeas hearing, appears limited to refuting the reason why Fiore was killed and not a denial of the petitioner's participation either as a principal or accessory in the homicide. Motive, while often an important consideration in a criminal case, is not an element of the crime requiring proof of its existence beyond a reasonable doubt, State v. Harris, 182 Conn. 220, 224 (1980). It is of no legal moment that the victim was beaten to death because he was suspected to be a child molester instead of an informant.
In order to satisfy the prejudice prong of the Strickland standard, the petitioner must prove, by a preponderance of the evidence, that there exists a reasonable probability that the result of the proceedings would have been different but for the purported, professional errors of counsel, Levine v. Manson,195 Conn. 636, 640 (1985). Reasonable probability means a probability sufficient to undermine confidence in the verdict, Bunkley v. Commissioner, 222 Conn. 444, 454 (1992). The petitioner must show that there is a reasonable probability that he remains burdened by an unreliable determination of guilt, Id. Based on all the evidence before the court, the court finds that no such reasonable probability exists even if both Wright and the petitioner testified at the criminal trial.
For the above reasons the petition is dismissed.
Sferrazza, J. CT Page 1633