## STATE OF CONNECTICUT *v.* GEORGE DYSON (15185)

Peters, C. J., and Callahan, Borden, Katz and Palmer, Js.

Argued May 30—officially released August 13, 1996

*Norman A. Pattis*, with whom, on the brief, was *John R. Williams*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, George Dyson, appeals[1] from his conviction, after a jury trial, of kidnap-

---

[1] The defendant initially appealed from the judgment of conviction to the Appellate Court. The appeal, however, was transferred to this court pursuant to Practice Book § 4027.

ping in the first degree as an accessory in violation of General Statutes §§ 53a-92 (a) (2) (C) and 53a-8 (a), and robbery in the first degree as an accessory in violation of General Statutes §§ 53a-134 (a) (3) and 53a-8 (a).[2] The defendant claims that: (1) the trial court improperly refused, in violation of his right to due process of law under the federal constitution, to instruct the jury that it must unanimously agree on the form of accessorial liability set forth in § 53a-8 (a) for which the defendant was to be held criminally liable; (2) the evidence presented at trial was insufficient to warrant the trial court's jury instruction on each of the five allegedly different forms of accessorial liability; and (3) § 53a-92 (a) (2) (C) is unconstitutionally vague on its face and as applied to his conduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early evening hours of August 27, 1992, the victims, John Bates and Andrew Dowd, set out in Bates' pickup truck to do some fishing at the reservoir in the town of Cheshire. The spot where the victims intended to fish is accessible by a single lane dirt road that intersects with Route 68 near the border of the towns of Cheshire and Wallingford. After driving approximately 200 yards down the dirt road, the victims came upon

---

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-92 provides in relevant part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (C) terrorize him or a third person . . . . "

General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 . . . he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

a clearing, known as the "sand pit." As they approached the area, each noticed a campfire to the left and, as a result, Bates stopped the truck.

At that point, the defendant and a companion, James Mesite, walked out of a wooded area that was to the right of the clearing and approached the truck. The victims remained seated in the vehicle. Mesite walked to the driver's side of the truck, while the defendant went to the passenger side. Mesite immediately began to act in an abusive and threatening manner toward Dowd and Bates, informing them that he had recently been released from prison, that he and the defendant were members of the Diablos motorcycle gang, that the area in which the victims had intended to fish belonged solely to the Diablos gang and that the victims had no business being in that area.[3] The defendant heard and acquiesced in Mesite's statements.

Thereafter, Mesite reached through the truck's open window on the driver's side and attempted to grab the keys from the ignition. Reacting to Mesite's intrusion, Bates forcibly pushed away Mesite's hand. Mesite then jerked open the door of the truck, grabbed Bates and began shaking him, attempting to pull him from behind the wheel. During this time, the defendant, who was standing very close to the passenger side door, informed Bates that, even if he did not give Mesite the keys, the defendant and Mesite were going to steal the truck. The victims then exited the truck. After they did so, Mesite again threatened Bates, yelling, "I'm going to kill you," while at the same time challenging him to fight. The defendant remained by the passenger side door, standing in a threatening manner, and offering no objections to Mesite's actions or statements.

---

[3] Bates and Dowd testified that they had known, based upon newspaper reports, that the Diablos gang was a local motorcycle gang with an unsavory reputation.

At one point during this interchange, Bates attempted to reenter the truck in order to leave the area. Mesite, however, prevented Bates from reentering the truck and repeatedly attempted to slam the door on Bates. Thereafter, in an effort to extricate themselves from the secluded wooded area of the reservoir so that they might obtain some help, Dowd suggested that he and Bates take Mesite and the defendant to a bar. Mesite and the defendant agreed. Mesite, however, apparently suspicious of the victims' intentions, informed Bates that he was going to drive the truck. Bates immediately voiced his objection, but, after the defendant instructed Bates to let Mesite drive, Bates relented and allowed Mesite to drive. All four men then proceeded to get into the truck, with Mesite occupying the driver's seat and Bates in the passenger seat, and the defendant and Dowd seated side by side in the bed of the truck.

When leaving the sand pit, Mesite attempted to drive the truck directly through the campfire, which had not been extinguished. Bates, realizing that Mesite was heading for the campfire, pulled the truck's emergency brake and informed the defendant that he was not going to allow Mesite to drive the truck. The defendant again intervened and, in an aggressive tone, told Bates to "[l]et [Mesite] drive the truck." Bates again relented, and Mesite sped up the dirt road and turned onto Route 68, heading toward Wallingford.

On Route 68, Mesite began to drive erratically, recklessly switching lanes and driving toward oncoming vehicles. As they approached an intersection, which was located approximately one-half mile from their starting point, Bates grabbed the steering wheel, pulled the emergency brake and removed the keys from the ignition. He then informed Mesite that, because of his reckless driving, he would no longer let him drive the truck. Initially, Mesite reacted in an aggressive manner and refused Bates' suggestion that Bates drive. The

defendant again intervened and told Mesite to let Bates drive. Mesite obeyed the defendant's directive without objection, and seated himself in the passenger's seat, while Bates took the wheel. At this point, Dowd attempted to reason with the defendant and explained that he knew the leader of the Diablos gang. The defendant, however, was unimpressed and informed Dowd that that did not mean anything to him, and that he and Mesite were going to continue with their chosen course of action.

Thereafter, Bates drove wherever Mesite directed him. After driving for a short while, Bates renewed the suggestion that they go to a bar. After receiving agreement from Mesite, Bates pulled into the parking lot of a nearby cafe, which was located on Route 68. As Bates drove the truck into the lot, Mesite, dissatisfied with Bates' choice, began yelling at Bates that the bar was a "James Gang" bar and that they were not going to go in there because he and the defendant were members of the Diablos gang.[4] Mesite further stated that he and the defendant were going to kill Bates and Dowd because Mesite believed them to be members of the James gang. As a result of Mesite's statements, Bates quickly left the parking lot. Mesite, however, apparently still upset over Bates' choice of bars, informed Bates and Dowd that "[w]e're going to take you to the [Diablos gang] clubhouse, [and] we're going to lock you up and torture you for a couple of weeks."

Thereafter, as Bates drove the truck, Mesite demanded, through the open slider window between the truck's cab and bed, that Dowd give him his wallet. When Dowd refused, Mesite asked the defendant for a weapon. The defendant then inquired whether he wanted the knife or the "nine," a reference to a nine

---

[4] Bates and Dowd knew that the James gang was a local motorcycle gang that was a rival of the Diablos gang.

millimeter handgun. When Mesite indicated that he preferred the knife, the defendant handed it to him through the slider. Mesite then put the knife to Bates' face and throat, and repeatedly threatened to cut his throat and to kill him. At the same time, the defendant removed a gun from his right side and, holding it down low by his side, pointed it at Dowd. As they continued to drive, Mesite indicated to Dowd that the defendant was going to shoot and kill him.

When they stopped at a red light while southbound on Route 5 in Wallingford, Dowd was able to get Bates' attention via the side view mirror, and, after making eye contact with Bates, reached over the side of the truck bed and pulled the tailgate handle. Dowd then rolled out of the truck onto the road and ran to a nearby restaurant. Mesite immediately put the knife to Bates' face and instructed him to drive into the restaurant parking lot, which Bates did. Once there, Bates was able to distract Mesite momentarily, grab his arm, smash it against the windshield, open the truck door and flee. He then ran inside the restaurant and told an employee to call the police. Mesite and the defendant then fled in the truck, but were eventually apprehended in the town of Guilford after a lengthy police chase.

In a substitute information, the state charged the defendant with two counts of kidnapping in the first degree, one count of robbery in the first degree and one count of larceny in the second degree in violation of General Statutes §§ 53a-123 (a) (1)[5] and 53a-8 (a). The jury found the defendant guilty of both counts of kidnapping and the sole count of robbery, but acquitted him of larceny. Thereafter, the court imposed a total effective sentence of twenty-nine years imprisonment,

---

[5] General Statutes § 53a-123 provides in relevant part: "(a) A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and: (1) The property consists of a motor vehicle, the value of which exceeds five thousand dollars . . . ."

execution suspended after twenty-four years, and five years probation.[6] Other facts will be recounted as necessary.

I

The defendant first claims that, in violation of his right to due process of law guaranteed by the fourteenth amendment to the federal constitution,[7] the trial court improperly failed to require a unanimous verdict with regard to his accessorial liability. Specifically, the defendant contends that the trial court was constitutionally required to give a specific unanimity instruction with regard to each allegedly different theory of accessorial liability set forth in § 53a-8 (a). We are not persuaded.

The following facts are relevant to this claim. In instructing the jury, the trial court initially explained that the defendant was being prosecuted as an accessory to kidnapping, robbery and larceny and then read the text of § 53a-8 (a) to the jury. The court further explained that "[t]he accessory statute does not connect the various acts as specified by the word 'and' but instead separates them by the word 'or.' The other person is an accessory to the commission of a crime if acting with the mental state required, that is the criminal intent required by statute for the commission of that crime, he solicits or requests or commands or importunes or intentionally aids another person in the com-

---

[6] The trial court sentenced the defendant to concurrent terms of fourteen years of imprisonment on each kidnapping count to be served consecutively with a term of fifteen years of imprisonment, execution suspended after ten years, five years probation, on the robbery count.

[7] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The defendant has not raised a separate claim under the state constitution. We, therefore, limit our analysis to the federal constitution. *State* v. *Faust*, 237 Conn. 454, 468 n.16, 678 A.2d 910 (1996).

mission of the crime." The court then defined each of the alternatives set forth in § 53a-8 (a).[8] During the remainder of its charge, the trial court gave the jury six general unanimity instructions.[9]

In *State* v. *Famiglietti*, 219 Conn. 605, 619–20, 595 A.2d 306 (1991), we set forth a multipartite test to determine whether a trial court's omission of a specific unanimity charge warrants a new trial. "We first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter. Even if the instructions at trial can be read to have sanctioned such a nonunanimous verdict, however, we will remand for a new trial only if (1) there is a conceptual distinction between the alternative acts with which the defendant has been charged, and (2) the state has presented evidence to support each alternative act with which the defendant has been charged." Id., 619–20; see also *State* v. *Reddick*, 224 Conn. 445, 453, 619 A.2d 453 (1993).

The defendant claims that the trial court's instructions to the jury sanctioned a nonunanimous verdict as to his accessorial liability. In support of that claim, he argues that, although the trial court gave several general unanimity instructions, the court did not expressly inform the jury that it must unanimously agree on one of the particular alternatives set forth in § 53a-8 (a) as the basis for its conclusion that the defendant was an

---

[8] The court stated that "[t]o solicit is to try to persuade someone to commit the crime. To request is to ask. To command is to order. To importune is to ask repeatedly. To aid is to help or assist."

[9] During its instructions to the jury, the court stated, for example, that "[i]f you find the defendant guilty of kidnapping in the first degree, you stop right there. If, however, you *unanimously* find the defendant not guilty of kidnapping first degree, then you consider kidnapping second degree." (Emphasis added.) The trial court further instructed the jury that "[t]he verdicts you render must be *unanimous* whether they be guilty or not guilty." (Emphasis added.)

accessory. The defendant maintains, therefore, that, based on the trial court's use of the disjunctive in its instructions explaining § 53a-8 (a) to the jury, the jurors could have disagreed on the particular statutory alternative applicable to the defendant's conduct, yet collectively could have agreed that he was an accessory to the kidnapping and robbery of the victims.

As we have previously stated, "the absence of language expressly sanctioning a nonunanimous verdict means that the defendant has not met the first part of the *Famiglietti* test." *State* v. *Reddick*, supra, 224 Conn. 454; see also *State* v. *Jennings*, 216 Conn. 647, 661–64, 583 A.2d 915 (1990); *State* v. *Anderson*, 211 Conn. 18, 35, 557 A.2d 917 (1989). Our review of the record fails to reveal a jury instruction that expressly sanctioned a nonunanimous verdict. The court, to the contrary, provided several general unanimity instructions to the jury. We do not, as the defendant would have us do, interpret the trial court's charge as implicitly sanctioning nonunanimity. Although the court did not give a specific unanimity instruction regarding the statutory alternatives, we cannot interpret the court's silence as sanctioning a nonunanimous verdict. See *State* v. *Reddick*, supra, 454.

Even if we were to agree with the defendant that the court sanctioned a nonunanimous verdict, we have previously held that the § 53a-8 (a) alternate theories of liability are not conceptually distinct. See *State* v. *Smith*, 212 Conn. 593, 563 A.2d 671 (1989). In *Smith*, we concluded that "the alternative bases of liability under § 53a-8 [a] are practically indistinguishable. They represent slightly different characterizations that can be given the defendant's particular conduct, all of which make a defendant an accessory to a crime. Therefore, the terms of § 53a-8 [a] are not conceptually distinct. Accordingly, the trial court did not err by failing to give

a specific unanimity charge on each theory of liability under the statute." Id., 606–607.[10]

We conclude, therefore, that the trial court's instruction to the jury did not violate that defendant's federal constitutional right to a unanimous verdict.

## II

The defendant next claims that there was insufficient evidence for the trial court to instruct the jury on each of the statutory alternatives for accessorial liability set forth in § 53a-8 and that, therefore, the trial court's instruction on each alternative violated his constitutional right to due process of law and requires a new trial. Because the defendant has failed to provide any independent analysis under the state constitution,[11] we limit our analysis to the federal constitution. *State* v. *Barnes*, 232 Conn. 740, 744 n.4, 657 A.2d 611 (1995).

In the trial court, the defendant "object[ed] to any instruction on the statutory alternatives not [sic] supported by the evidence, i.e., 'solicits, requests, commands, importunes' " because, in his view, there was no evidentiary basis for those alternatives.[12] The court rejected the defendant's request, concluding that, based upon the evidence, the jury could reasonably infer that

[10] The defendant has not cited *State* v. *Smith,* supra, 212 Conn. 593, in his brief and, as a result, has not articulated any reason for us to reconsider this conclusion.

[11] In a footnote of his brief, the defendant claims that the trial court's instruction violated his right to due process under the state constitution. That, however, is the extent of his state constitutional analysis. The defendant does not provide any independent analysis under the state constitution; nor, in fact, does he even mention the article or section number of our state constitution's due process clause. Mere passing reference to the state constitution in a footnote does not suffice to invoke review under the state constitution.

[12] We note that the defendant did not request that the trial court refrain from instructing the jury on the "intentionally aided" alternative for accessory liability, nor did he specifically object to that portion of the instruction after it had been given.

the defendant acted in a manner consistent with each statutory alternative. The defendant renews his claim on appeal. We are not persuaded.

At oral argument, the defendant conceded that, based upon our recent decision in *State* v. *Chapman*, 229 Conn. 529, 539–44, 643 A.2d 1213 (1994), if a statute contains alternate theories of liability, a jury's verdict must be affirmed if there is sufficient evidence to support a finding of guilty on at least one theory of liability. In *Chapman*, we relied on the decision of the United States Supreme Court in *Griffin* v. *United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), and concluded that a defendant's constitutional right to due process of law is not violated when the trial court charges the jury on a factually unsupported basis of criminal liability provided that, in addition to that instruction, the trial court instructs the jury on a factually supported basis.

Our review of the evidence persuades us that there was sufficient evidence for the jury to have concluded that the defendant intentionally aided Mcsite in the commission of the robbery and the kidnapping and, therefore, that he was properly convicted as an accessory. "In reviewing [a] sufficiency [of the evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Mejia*, 233 Conn. 215, 223–24, 658 A.2d 571 (1995)." (Citation omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 236 Conn. 189, 195, 672 A.2d 488 (1996).

The defendant had told Bates that if he did not give Mesite the keys to his truck, the defendant and Mesite

would simply steal the truck anyway. The defendant also intervened when Bates objected to Mesite's driving the truck from the area of the sand pit, commanding Bates to permit Mesite to drive. In addition, the defendant provided Mesite with the knife that he used to threaten Bates repeatedly while Bates drove the occupants in search of a bar. The defendant also pointed a gun at Dowd as the two sat side by side in the bed of the truck during the drive. The defendant never voiced any disagreement with Mesite regarding either his repeated threats to kill the victims or his statement that he and the defendant were going to take the victims to the Diablos gang clubhouse and torture them for two weeks. The defendant also fled from the restaurant parking lot with Mesite in Bates' truck. We conclude, therefore, that there was sufficient evidence for the jury to find that the defendant intentionally aided Mesite in the commission of the kidnapping and robbery.

## III

The defendant next claims that, in violation of the fourteenth amendment to the federal constitution, § 53a-92 (a) (2) (C) is unconstitutionally vague on its face and as applied to his conduct. We disagree.

Our analysis is guided by certain fundamental principles of constitutional vagueness jurisprudence. "Under the requirements of due process of law mandated by our federal and state constitutions, a penal statute must be sufficiently definite to enable a person to know what conduct he must avoid. . . . [A] statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. . . . *State* v. *Linares*, 232 Conn. 345, 354, 655 A.2d 737 (1995); *State* v. *Williams*, 205 Conn. 456, 469–70, 534 A.2d 230 (1987)." (Citations omitted; internal quotation marks

omitted.) *Benjamin* v. *Bailey*, 234 Conn. 455, 483, 662 A.2d 1226 (1995).

"In a facial vagueness challenge, we . . . examine the challenged statute to see if it is impermissibly vague in all of its applications. A statute that is impermissibly vague in all its applications is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. . . . Such a provision simply has *no* core." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Indrisano*, 228 Conn. 795, 804, 640 A.2d 986 (1994).

To prevail on his facial vagueness claim, therefore, the defendant must demonstrate that the statute has no core meaning. "Put another way, a determination that the statute is not vague with respect to at least one application will defeat [his] facial challenge. This burden is augmented by our strong presumption . . . in favor of a statute's constitutionality. . . . *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991) . . . ." (Citations omitted.) *Benjamin* v. *Bailey*, supra, 234 Conn. 484.

Section 53a-92 (a) provides in relevant part that "[a] person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted *with intent to . . . (C) terrorize* him or a third person . . . ." (Emphasis added.) The defendant contends that that section is simply a restatement of General Statutes § 53a-94 (a), which provides that "[a] person is guilty of kidnapping in the second degree when he abducts another person." In the defendant's view, because every kidnapping induces a substantial amount of fear on the part of the abductee, the perpetrator of the kidnapping necessarily possesses

the intent to terrorize. The defendant maintains, therefore, that the intent to terrorize element of § 53a-92 (a) (2) (C) is redundant and merely restates an element that accompanies every kidnapping and, as such, does not provide fair and adequate notice of the more culpable conduct that it seeks to proscribe. We disagree.

We have not yet had occasion to interpret the "intent to terrorize" element of kidnapping in the first degree. We have, however, previously stated that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the [defendant] that his conduct is proscribed." (Internal quotation marks omitted.) *State* v. *Indrisano*, supra, 228 Conn. 803; see also *State* v. *Dupree*, 196 Conn. 655, 663, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985). In addition, it is well established that "[i]f a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary. General Statutes § 1-1 (a); see also *Ziperstein* v. *Tax Commissioner*, 178 Conn. 493, 500, 423 A.2d 129 (1979) . . . ." (Citations omitted.) *State* v. *Indrisano*, supra, 809–10. Webster's Third New International Dictionary (1966) includes among its definitions of "terrorize"—"to fill with terror or anxiety." In addition, terror is defined, in part, as a "state of intense fright or apprehension; stark fear."

We are persuaded that § 53a-92 (a) (2) (C) has a core meaning sufficient to sustain it against a facial attack because it provides adequate notice of the type of conduct that it seeks to proscribe. Section 53a-92 (a) (2) (C) criminalizes conduct in which the perpetrator not only abducts an individual, but in addition thereto engages in conduct specifically intended to cause the abductee or a third person to experience "intense . . . stark fear." While it seems likely that every kidnapping

would induce some degree of fear on the part of the abductee, not every perpetrator possesses the specific intent to terrorize his victim.[13] The legislature has recognized that distinction and has criminalized the conduct of the kidnapper that is intended to cause terror for its own sake. "Our adoption of this interpretive gloss provides a sufficient core of meaning to remedy any facial vagueness that might otherwise exist." *Benjamin* v. *Bailey*, supra, 234 Conn. 487.

The defendant argues further that even if we were to reject his facial vagueness challenge, § 53a-92 (a) (2) (C) is vague as applied to his conduct because he claims that he is being punished solely because of Mesite's assertion that he and Mesite were members of the Diablos motorcycle gang.[14] He contends that the statute is vague as applied because people must now be uncertain as to which of their associations might support an inference of intent to terrorize. We disagree. Contrary to the defendant's contention, the state adduced ample evidence, in addition to Mesite's statement concerning the Diablos gang, that the defendant's conduct violated § 53a-92 (a) (2) (C). Furthermore, the statute provided ample warning that his conduct was prohibited. The defendant is not being punished solely for Mesite's assertion of association but because the evidence viewed in its entirety manifested an intent to terrorize. Moreover, it is only when an association is flaunted with the specific intent to terrorize that it becomes relevant to the proof of the elements of § 53a-92 (a) (2) (C). Because intent to terrorize is a necessary element of the crime, the statute is not vague as applied. See *State* v. *Cavallo*, 200 Conn. 664, 672, 513 A.2d 646 (1986).

---

[13] A person can, for example, kidnap another with the intent to collect a ransom, without having the specific intent to terrorize or cause intense fright in the abductee or a third person.

[14] We note that at oral argument the defendant acknowledged that he had not raised a challenge to the constitutionality of § 53a-92 (a) (2) (C) under the first amendment to the federal constitution.

We conclude, therefore, that § 53a-92 (a) (2) (C) is not vague as applied to the defendant's conduct.

The judgment is affirmed.

In this opinion the other justices concurred.